# IN RE GRIFFITHS

No. 71–1336.   Argued January 9, 1973—Decided June 25, 1973

POWELL, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined. BURGER, C. J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 730.   REHNQUIST, J., filed a dissenting opinion, *ante*, p. 649.

*R. David Broiles* argued the cause for appellant. With him on the brief were *Melvin L. Wulf* and *Joel M. Gora*.

*George R. Tiernan* argued the cause and filed a brief for the State Bar Examining Committee of Connecticut.*

MR. JUSTICE POWELL delivered the opinion of the Court.

This case presents a novel question as to the constraints imposed by the Equal Protection Clause of the

*\*Louis J. Lefkowitz, pro se, Samuel A. Hirshowitz,* First Assistant Attorney General, and *Daniel M. Cohen,* Assistant Attorney General, filed a brief for the Attorney General of New York as *amicus curiae* urging affirmance.

Fourteenth Amendment on the qualifications which a State may require for admission to the bar. Appellant, Fre Le Poole Griffiths, is a citizen of the Netherlands who came to the United States in 1965, originally as a visitor. In 1967 she married a citizen of the United States and became a resident of Connecticut.[1] After her graduation from law school, she applied in 1970 for permission to take the Connecticut bar examination. The County Bar Association found her qualified in all respects save that she was not a citizen of the United States as required by Rule 8 (1) of the Connecticut Practice Book (1963),[2] and on that account refused to allow her to take the examination. She then sought judicial relief, asserting that the regulation was unconstitutional but her claim was rejected, first by the Superior Court and ultimately by the Connecticut Supreme Court. 162 Conn. 249, 294 A. 2d 281 (1972). We noted probable jurisdiction, 406 U. S. 966 (1972), and now hold that the rule unconstitutionally discriminates against resident aliens.[3]

# I

We begin by sketching the background against which the State Bar Examining Committee attempts to justify

---

[1] Appellant is eligible for naturalization by reason of her marriage to a citizen of the United States and residence in the United States for more than three years, 8 U. S. C. § 1430 (a). She has not filed a declaration of intention to become a citizen of the United States, 8 U. S. C. § 1445 (f), and has no present intention of doing so. Brief for Appellant 4. In order to become a citizen, appellant would be required to renounce her citizenship of the Netherlands. 8 U. S. C. § 1448 (a).

[2] The rules are promulgated by the judges of the Superior Court, Conn. Gen. Stat. Rev. § 51–80, and administered by the Connecticut Bar Examining Committee. The position of the State in this case is represented by that Committee.

[3] Because we find that the rule denies equal protection, we do not reach appellant's other claims.

the total exclusion of aliens from the practice of law. From its inception, our Nation welcomed and drew strength from the immigration of aliens. Their contributions to the social and economic life of the country were self-evident, especially during the periods when the demand for human resources greatly exceeded the native supply. This demand was by no means limited to the unskilled or the uneducated. In 1873, this Court noted that admission to the practice of law in the courts of a State

> "in no sense depends on citizenship of the United States. It has not, as far as we know, ever been made in any State, or in any case, to depend on citizenship at all. Certainly many prominent and distinguished lawyers have been admitted to practice, both in the State and Federal courts, who were not citizens of the United States or of any State." *Bradwell* v. *State,* 16 Wall. 130, 139.[4]

But shortly thereafter, in 1879, Connecticut established the predecessor to its present rule totally excluding aliens from the practice of law. 162 Conn., at 253, 294 A. 2d, at 283. In subsequent decades, wide-ranging restrictions for the first time began to impair significantly the efforts of aliens to earn a livelihood in their chosen occupations.[5]

In the face of this trend, the Court nonetheless held in 1886 that a lawfully admitted resident alien is a "person" within the meaning of the Fourteenth Amendment's

---

[4] We do not, of course, rely on *Bradwell* to establish that admission to the bar may not be made to depend on citizenship. The holding of that case was simply that the right to practice law is not a "privilege or immunity" within the meaning of the Fourteenth Amendment.

[5] See J. Higham, Strangers in the Land 46, 161, 183 (1963). The full scale of restrictions imposed on the work opportunities of aliens in 1946 is shown by M. Konvitz, The Alien and the Asiatic in American Law 190–211 (1946).

directive that a State must not "deny to any person within its jurisdiction the equal protection of the laws." *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369. The decision in *Yick Wo* invalidated a municipal ordinance regulating the operation of laundries on the ground that the ordinance was discriminatorily enforced against Chinese operators. Some years later, the Court struck down an Arizona statute requiring employers of more than five persons to employ at least 80% "qualified electors or native-born citizens of the United States or some subdivision thereof." *Truax* v. *Raich*, 239 U. S. 33, 35 (1915). As stated for the Court by Mr. Justice Hughes:

> "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure. [Citations omitted.] If this could be refused solely upon the ground of race or nationality, the prohibition of the denial to any person of the equal protection of the laws would be a barren form of words." *Id.,* at 41.

To be sure, the course of decisions protecting the employment rights of resident aliens has not been an unswerving one.[6] In *Clarke* v. *Deckebach*, 274 U. S. 392 (1927), the Court was faced with a challenge to a city ordinance prohibiting the issuance to aliens of licenses to operate pool and billiard rooms. Characterizing the business as one having "harmful and vicious tendencies," the Court found no constitutional infirmity in the ordinance:

> "It was competent for the city to make such a choice, not shown to be irrational, by excluding from

---

[6] See also *People* v. *Crane*, 214 N. Y. 154, 108 N. E. 427, aff'd *sub nom. Crane* v. *New York*, 239 U. S. 195 (1915); but see *Graham* v. *Richardson*, 403 U. S. 365, 374 (1971).

the conduct of a dubious business an entire class rather than its objectionable members selected by more empirical methods." *Id.*, at 397.

This easily expandable proposition supported discrimination against resident aliens in a wide range of occupations.[7]

But the doctrinal foundations of *Clarke* were undermined in *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410 (1948), where, in ruling unconstitutional a California statute barring issuance of fishing licenses to persons "ineligible to citizenship," the Court stated that "the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits." *Id.*, at 420. Indeed, with the issue squarely before it in *Graham* v. *Richardson,* 403 U. S. 365 (1971), the Court concluded:

> "[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority (see *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–153, n. 4 (1938)) for whom such heightened judicial solicitude is appropriate." *Id.*, at 372. (Footnotes omitted.)

The Court has consistently emphasized that a State which adopts a suspect classification "bears a heavy burden of justification," *McLaughlin* v. *Florida,* 379 U. S. 184, 196 (1964), a burden which, though variously formulated, requires the State to meet certain standards of proof. In order to justify the use of a suspect classification, a State must show that its purpose or interest is

---

[7] See lower court cases collected at Note, Constitutionality of Restrictions on Aliens' Right to Work, 57 Col. L. Rev. 1012, 1021–1023 (1957) (restrictions ranging from the vending of soft drinks to the selling of lightning rods).

both constitutionally permissible [8] and substantial,[9] and that its use of the classification is "necessary . . . to the accomplishment" of its purpose [10] or the safeguarding of its interest.[11]

Resident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society. It is appropriate that a State bear a heavy burden when it deprives them of employment opportunities.

## II

We hold that the Committee, acting on behalf of the State, has not carried its burden. The State's ultimate interest here implicated is to assure the requisite qualifications of persons licensed to practice law.[12] It is undisputed that a State has a constitutionally permissible and substantial interest in determining whether an appli-

---

[8] Discrimination or segregation for its own sake is not, of course, a constitutionally permissible purpose. *E. g., Brown* v. *Board of Education,* 347 U. S. 483, 495 (1954); *McLaughlin* v. *Florida,* 379 U. S. 184 (1964).

[9] The state interest required has been characterized as "overriding," *id.,* at 196; *Loving* v. *Virginia,* 388 U. S. 1, 11 (1967); "compelling," *Graham* v. *Richardson, supra,* at 375; "important," *Dunn* v. *Blumstein,* 405 U. S. 330, 343 (1972), or "substantial," *ibid.* We attribute no particular significance to these variations in diction.

[10] *McLaughlin* v. *Florida, supra,* at 196; cf. *Loving* v. *Virginia, supra,* at 11.

[11] We did not decide in *Graham* nor do we decide here whether special circumstances, such as armed hostilities between the United States and the country of which an alien is a citizen, would justify the use of a classification based on alienage.

[12] Appellant denies that this was indeed the State's purpose in requiring citizenship for the practice of law, noting that citizenship is also required of practitioners in other fields, including hairdressers and cosmeticians, Conn. Gen. Stat. Rev. § 20–250, architects, Conn. Gen. Stat. Rev. § 20–291, and sanitarians, Conn. Gen. Stat. Rev. § 20–361. Because we dispose of the case on other grounds, we do not reach this claim.

cant possesses " 'the character and general fitness requisite for an attorney and counselor-at-law.' " *Law Students Research Council* v. *Wadmond,* 401 U. S. 154, 159 (1971). See also *Konigsberg* v. *State Bar,* 366 U. S. 36, 40–41 (1961); *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 239 (1957).[13] But no question is raised in this case as to appellant's character or general fitness. Rather, the sole basis for disqualification is her status as a resident alien.

The Committee defends Rule 8 (1)'s requirement that applicants for admission to the bar be citizens of the United States on the ground that the special role of the lawyer justifies excluding aliens from the practice of law. In Connecticut, the Committee points out, the maxim that a lawyer is an "officer of the court" is given concrete meaning by a statute which makes every lawyer a "commissioner of the Superior Court." As such, a lawyer has authority to "sign writs and subpoenas, take recognizances, administer oaths and take depositions and acknowledgements of deeds." Conn. Gen. Stat. Rev. § 51–85. In the exercise of this authority, a Connecticut lawyer may command the assistance of a county sheriff or a town constable. Conn. Gen. Stat. Rev. § 52–90. Because of these and other powers, the Connecticut Supreme Court commented that

> "[t]he courts not only demand [lawyers'] loyalty, confidence and respect but also require them to function in a manner which will foster public confidence

---

[13] In this connection, Mr. Justice Frankfurter wrote:

"From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as 'moral character.' " *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 247 (1957) (concurring opinion).

> in the profession and, consequently, the judicial system." 162 Conn., at 262–263, 294 A. 2d, at 287.

In order to establish a link between citizenship and the powers and responsibilities of the lawyer in Connecticut, the Committee contrasts a citizen's undivided allegiance to this country with a resident alien's possible conflict of loyalties. From this, the Committee concludes that a resident alien lawyer might in the exercise of his functions ignore his responsibilities to the courts or even his clients in favor of the interest of a foreign power.

We find these arguments unconvincing. It in no way denigrates a lawyer's high responsibilities to observe that the powers "to sign writs and subpoenas, take recognizances, [and] administer oaths" hardly involve matters of state policy or acts of such unique responsibility as to entrust them only to citizens. Nor do we think that the practice of law offers meaningful opportunities adversely to affect the interest of the United States. Certainly the Committee has failed to show the relevance of citizenship to any likelihood that a lawyer will fail to protect faithfully the interest of his clients.[14]

---

[14] Lawyers frequently represent foreign countries and the nationals of such countries in litigation in the courts of the United States, as well as in other matters in this country. In such representation, the duty of the lawyer, subject to his role as an "officer of the court," is to further the interests of his clients by all lawful means, even when those interests are in conflict with the interests of the United States or of a State. But this representation involves no conflict of interest in the invidious sense. Rather, it casts the lawyer in his honored and traditional role as an authorized but independent agent acting to vindicate the legal rights of a client, whoever it may be. It is conceivable that an alien licensed to practice law in this country could find himself in a position in which he might be called upon to represent his country of citizenship against the United States in circumstances in which there may be a conflict between his obligations to the two countries. In such rare situations, an honorable person, whether an alien or not, would decline the representation.

Nor would the possibility that some resident aliens are unsuited to the practice of law be a justification for a wholesale ban.

> "Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory. Cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356." *Schware* v. *Board of Bar Examiners,* 353 U. S., at 239.

This constitutional warning is especially salient where, as here, a State's bar admission standards make explicit use of a suspect classification. Although, as we have acknowledged, a State does have a substantial interest in the qualifications of those admitted to the practice of law, the arguments advanced by the Committee fall short of showing that the classification established by Rule 8 (1) of the Connecticut Practice Book (1963) is necessary to the promoting or safeguarding of this interest.

Connecticut has wide freedom to gauge on a case-by-case basis the fitness of an applicant to practice law. Connecticut can, and does, require appropriate training and familiarity with Connecticut law. Apart from such tests of competence, it requires a new lawyer to take both an "attorney's oath" to perform his functions faithfully and honestly [15] and a "commissioner's oath" to "support

---

[15] The text of the attorney's oaths is as follows:

"You solemnly swear that you will do no falsehood, nor consent to any to be done in court, and, if you know of any to be done, you will give information thereof to the judges, or one of them, that it may be reformed; you will not wittingly, or willingly promote, sue or cause to be sued, any false or unlawful suit, or give aid, or consent, to the same; you will delay no man for lucre or malice; but will exercise the office of attorney, within the court wherein you may practice, according to the best of your learning and discretion, and

the constitution of the United States, and the constitution of the state of Connecticut." [16] Appellant has indicated her willingness and ability to subscribe to the substance of both oaths,[17] and Connecticut may quite properly conduct a character investigation to insure in any given case "that an applicant is not one who 'swears to an oath *pro forma* while declaring or manifesting his disagreement with or indifference to the oath.' *Bond* v. *Floyd,* 385 U. S. 116, 132." *Law Students Research Council* v. *Wadmond,* 401 U. S., at 164.[18] Moreover, once

---

with fidelity, as well to the court as to your client, so help you God." Jurisdictional Statement 44.

[16] There is no question as to the validity of requiring an applicant, as a precondition to admission to the bar, to take such an oath. *Law Students Research Council* v. *Wadmond,* 401 U. S. 154, 161–164 (1970).

[17] Because the commissioner's oath is an oath to "support the constitution of the United States, and the constitution of the State of Connecticut, *so long as you continue a citizen thereof,*" Conn. Gen. Stat. Rev. § 1–25 (emphasis added), appellant could not of course take the oath as prescribed. To the extent that the oath reiterates Rule 8 (1)'s citizenship requirement, it shares the same constitutional defects when required of prospective members of the bar.

[18] We find no merit in the contention that only citizens can in good conscience take an oath to support the Constitution. We note that all persons inducted into the Armed Services, including resident aliens, are required by 10 U. S. C. § 502 to take the following oath:

"I, ——————————, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to regulations and the Uniform Code of Military Justice. So help me God."

If aliens can take this oath when the Nation is making use of their services in the national defense, resident alien applicants for admission to the bar surely cannot be precluded, as a class, from taking an oath to support the Constitution on the theory that they are unable to take the oath in good faith.

admitted to the bar, lawyers are subject to continuing scrutiny by the organized bar and the courts. In addition to discipline for unprofessional conduct, the range of post-admission sanctions extends from judgments for contempt to criminal prosecutions and disbarment.[19] In sum, the Committee simply has not established that it must exclude all aliens from the practice of law in order to vindicate its undoubted interest in high professional standards.[20]

### III

In its brief, the Examining Committee makes another, somewhat different argument in support of Rule 8 (1). Its thrust is not that resident aliens lack the attributes necessary to maintain high standards in the legal profession, but rather that lawyers must be citizens almost as a matter of definition. The implication of this analysis is that exclusion of aliens from the legal profession is not subject to any scrutiny under the Equal Protection Clause.

---

[19] See, e. g., *Doolittle* v. *Clark*, 47 Conn. 316 (1879). Apart from the courts, the profession itself has long subjected its members to discipline under codes or canons of professional ethics. As early as 1908 the American Bar Association adopted 32 Canons of Professional Ethics. In 1970, following several years of study and reexamination, the House of Delegates of the American Bar Association approved a new Code of Professional Responsibility, which provides detailed ethical prescriptions as well as a comprehensive code of disciplinary rules. The ABA Code of Professional Responsibility has since been approved and adopted in the District of Columbia and in 46 States, including Connecticut.

[20] Nothing in our rules prohibits from admission to practice in this Court resident aliens who have been admitted to practice "for three years past in the highest court of a State, Territory, District, Commonwealth, or Possession" and whose "private and professional characters shall appear to be good." Rule 5, Rules of the Supreme Court.

The argument builds upon the exclusion of aliens from the franchise in all 50 States and their disqualification under the Constitution from holding office as President, Art. 2, § 1, cl. 5, or as a member of the House of Representatives, Art. 1, § 2, cl. 2, or of the Senate, Art. 1, § 3, cl. 3. These and numerous other federal and statutory and constitutional provisions reflect, the Committee contends, a pervasive recognition that "participation in the government structure as voters and office holders" is inescapably an aspect of citizenship. Brief for Appellee 11. Offered in support of the claim that the lawyer is an "office holder" in this sense is an enhanced version of the proposition, discussed above, that he is an "officer of the court." Specifically, the Committee states that the lawyer "is an officer of the Court who acts by and with the authority of the State" and is entrusted with the "exercise of actual government power." *Id.,* at 5.

We note at the outset that this argument goes beyond the opinion of the Connecticut Supreme Court, which recognized that a lawyer is not an officer in the ordinary sense. 162 Conn., at 254, 294 A. 2d, at 283. This comports with the view of the Court expressed by Mr. Justice Black in *Cammer* v. *United States,* 350 U. S. 399 (1956):

> "It has been stated many times that lawyers are 'officers of the court.' One of the most frequently repeated statements to this effect appears in *Ex parte Garland,* 4 Wall. 333, 378. The Court pointed out there, however, that an attorney was not an 'officer' within the ordinary meaning of that term. Certainly nothing that was said in *Ex parte Garland* or in any other case decided by this Court places attorneys in the same category as marshals, bailiffs, court clerks or judges. Unlike these officials a lawyer is engaged in a private profession, important though

it be to our system of justice. In general he makes his own decisions, follows his own best judgment, collects his own fees and runs his own business. The word 'officer' as it has always been applied to lawyers conveys quite a different meaning from the word 'officer' as applied to people serving as officers within the conventional meaning of that term." *Id.*, at 405 (footnote omitted).

Lawyers do indeed occupy professional positions of responsibility and influence that impose on them duties correlative with their vital right of access to the courts. Moreover, by virtue of their professional aptitudes and natural interests, lawyers have been leaders in government throughout the history of our country. Yet, they are not officials of government by virtue of being lawyers. Nor does the status of holding a license to practice law place one so close to the core of the political process as to make him a formulator of government policy.[21]

We hold that § 8 (1) violates the Equal Protection Clause.[22] The judgment of the Connecticut Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

[For dissenting opinion of MR. JUSTICE REHNQUIST, see *ante,* p. 649.]

---

[21] Because the Committee has failed to establish that the lawyer is an "office holder," we need not and do not decide whether there is merit in the general argument and, if so, to what offices it would apply.

[22] In a thoughtful opinion, the California Supreme Court unanimously declared unconstitutional a similar California rule. *Raffaelli* v. *Committee of Bar Examiners,* 7 Cal. 3d 288, 496 P. 2d 1264 (1972). See also *Application of Park,* 484 P. 2d 690 (Alaska 1971).

Mr. Chief Justice Burger, with whom Mr. Justice Rehnquist joins, dissenting.

I agree generally with Mr. Justice Rehnquist's dissent and add a few observations.

In the rapidly shrinking "one world" we live in there are numerous reasons why the States might appropriately consider relaxing some of the restraints on the practice of professions by aliens. The fundamental factor, however, is that the States reserved, among other powers, that of regulating the practice of professions within their own borders. If that concept has less validity now than in the 18th century when it was made part of the "bargain" to create a federal union, it is nonetheless part of that compact.

A large number of American nationals are admitted to the practice of law in more than a dozen countries; this will expand as world trade enlarges. But the question for the Court is not what is enlightened or sound *policy* but rather what the Constitution and its Amendments provide; I am unable to accord to the Fourteenth Amendment the expansive reading the Court gives it.

In recent years the Court, in a rather casual way, has articulated the code phrase "suspect classification" as though it embraced a reasoned constitutional concept. Admittedly, it simplifies judicial work as do "per se" rules, but it tends to stop analysis while appearing to suggest an analytical process.

Much as I agree with some aspects of the *policy* implicit in the Court's holding, I am bound—if I apply the Constitution as its words and intent speak to me—to reject the good policy the Court now adopts.

I am unwilling to accept what seems to me a denigration of the posture and role of a lawyer as an "officer of the court." It is that role that a State is entitled to rely on as a basis for excluding aliens from the practice

of law. By virtue of his admission a lawyer is granted what can fairly be called a monopoly of sorts; he is granted a license to appear and try cases; he can cause witnesses to drop their private affairs and be called for depositions and other pretrial processes that, while subject to the ultimate control of the court, are conducted by lawyers outside courtrooms; the enormous power of cross-examination of witnesses is granted exclusively to lawyers. Inherent in these large powers is the ability to compel answers subject, of course, to such limiting restraints as the Fifth Amendment and rules of evidence. In most States a lawyer is authorized to issue subpoenas commanding the presence of persons and even the production of documents under certain circumstances. The broad monopoly granted to lawyers is the authority to practice a profession and by virtue of that to do things other citizens may not lawfully do. In the common-law tradition the lawyer becomes the attorney—the *agent*— for a client only by virtue of his having been first invested with power by the State, usually by a court. The lawyer's obligations as an officer of the court permit the court to call on the lawyer to perform duties which no court could order citizens generally to do, including the obligation to observe codes of ethical conduct not binding on the public generally.

The concept of a lawyer as an officer of the court and hence part of the official mechanism of justice in the sense of other court officers, including the judge, albeit with different duties, is not unique in our system but it is a significant feature of the lawyer's role in the common law. This concept has sustained some erosion over the years at the hands of cynics who view the lawyer much as the "hired gun" of the Old West. In less flamboyant terms the lawyer in his relation to the client came to be called a "mouthpiece" in the gangland parlance of the 1930's. Under this bleak view of the profession the

lawyer, once engaged, does his client's bidding, lawful or not, ethical or not.

Whatever the erosion of the officer-of-the-court role, the overwhelming proportion of the legal profession rejects both the denigrated role of the advocate and counselor that renders him a lackey to the client and the alien idea that he is an agent of government. See American Bar Association Project on Standards for Criminal Justice, The Prosecution Function and the Defense Function § 1.1 (Approved Draft 1971).

The role of a lawyer as an officer of the court predates the Constitution; it was carried over from the English system and became firmly embedded in our tradition. It included the obligation of first duty to client. But that duty never was and is not today an absolute or unqualified duty. It is a first loyalty to serve the client's interest but always within—never outside—the law, thus placing a heavy personal and individual responsibility on the lawyer. That this is often unenforceable, that departures from it remain undetected, and that judges and bar associations have been singularly tolerant of misdeeds of their brethren, renders it no less important to a profession that is increasingly crucial to our way of life. The very independence of the lawyer from the government on the one hand and client on the other is what makes law a profession, something apart from trades and vocations in which obligations of duty and conscience play a lesser part. It is as crucial to our system of justice as the independence of judges themselves.

The history of the legal profession is filled with accounts of lawyers who risked careers by asserting their independent status in opposition to popular and governmental attitudes, as John Adams did in Boston to defend the soldiers accused in what we know in our folklore as the "Boston Massacre." To that could be added the

lawyers who defended John Peter Zenger and down to lawyers in modern times in cases such as *Johnson* v. *Zerbst,* 304 U. S. 458 (1938). The crucial factor in all these cases is that the advocates performed their dual role—officer of the court and advocate for a client— strictly within and never in derogation of high ethical standards. There is thus a reasonable, rational basis for a State to conclude that persons owing first loyalty to this country will grasp these traditions and apply our concepts more than those who seek the benefits of American citizenship while declining to accept the burdens of citizenship in this country.

In some countries the legal system is so structured that all lawyers are literally agents of government and as such bound to place the interests of government over those of the client. That concept is so alien to our system with an independent bar that I find it difficult to see how nationals of such a country, inculcated with those ideas and at the same time unwilling to accept American citizenship, could be properly integrated into our system. At the very least we ought not stretch the Fourteenth Amendment to force the States to accept any national of any country simply because of a recital of the required oath and passing of the bar examination.

Since the Court now strikes down a power of the States accepted as fundamental since 1787, even if States sometimes elected not to exercise it, cf. *Bradwell* v. *State,* 16 Wall. 130 (1873), the States may well move to adopt, by statute or rule of court, a reciprocal proviso, familiar in other contexts; under such a reciprocal treatment of applicants a State would admit to the practice of law the nationals of such other countries as admit American citizens to practice. I find nothing in the core holding of *Zschernig* v. *Miller,* 389 U. S. 429 (1968), to foreclose state adoption of such reciprocal provisions. See *Clark* v. *Allen,* 331 U. S. 503 (1947).