591 F.2d 997
 Lawrence A. UZZELL and Robert Lane Arrington, Individually,
and upon behalf of all others similarly situated, Appellants,
v.
William C. FRIDAY, Individually, and as President of the
University of North Carolina, Ferebee Taylor, Individually
and as Chancellor, Claiborne Jones, Individually and as
Vice-Chancellor, Marcus Williams, President of Student Body,
Timothy Dugan, Individually and Treasurer, etc., Board of
Trustees of the University of North Carolina at Chapel Hill,
and Board of Governors of the University of North Carolina,
and Algenon L. Marbley, Chairman of the Black Student
Movement, and Robert L. Wynn, II, Vice-Chairman of Black
Student Movement, Appellees.
 No. 75-2276.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 16, 1978.
Decided Feb. 2, 1979.
 
 Hugh J. Beard, Jr., Charlotte, N. C., for appellants.
 J. LeVonne Chambers, Charlotte, N. C. (Charles Becton, James C. Fuller, Jr., Chambers, Stein, Ferguson & Becton, P. A., Charlotte, N. C., Karen Galloway, Durham, N. C., Jack Greenberg, James M. Nabrit, III, Napoleon B. Williams, Jr., Judith Reed, New York City, on brief), Elizabeth C. Bunting, Asst. Atty. Gen., Raleigh, N. C. (Rufus L. Edmisten, Atty. Gen. of North Carolina and Andrew A. Vanore, Jr., Senior Deputy Atty. Gen., Raleigh, N. C., on brief), for appellees.
 Before HAYNSWORTH, Chief Judge, BRYAN, Senior Circuit Judge, and WINTER, BUTZNER, RUSSELL, WIDENER and HALL, Circuit Judges.
 ALBERT V. BRYAN, Senior Circuit Judge:
 
 
 1
 Obedient to the remittitur of the Supreme Court in vacating our judgment,[1] this court has given the case "further consideration in light of Regents of (the) University of California v. Bakke, 438 U.S. 265 (98 S.Ct. 2733, 57 L.Ed.2d 750) (1978)."[2] To be reexamined is the conclusion of invalidity laid, in the suit of appellant-white students, to two of the regulations and practices approved and effectuated by the University of North Carolina in its student government.
 
 
 2
 The first regulation in issue pertains to the legislative branch, the Campus Governing Council (CGC), elected annually by the student body. The CGC is composed of 18 members, but must include "at least two Councillors of a minority race within the Student Body (if any), two male Councillors and two female Councillors."[3] If the election does not satisfy this contingency, then the President of the Council (the president of the student body) shall make appointments from the students generally to fulfill this requisite.
 
 
 3
 The second questioned requirement relates to the composition of the judicial branch of the government, the Honor Court of the Student Body. Abbreviated, this latter provision stipulates that an accused, on request, is entitled to have four of the seven judges of the court of his or her race or sex.[4]
 
 
 4
 Appellants charge that these regulations and practices, in relying Exclusively on a racial criterion, deny them their Fourteenth Amendment rights of equal protection, and violate the Civil Rights Act of 1871 and Title VI of the Civil Rights Act of 1964.[5]
 
 
 5
 Bakke, we recognize, unequivocally pronounces that in State educational institutions race may be A consideration in fixing the rights of students, but at no stage did the Court affirm that race could be the sole determinant in any such adjustment. 438 U.S. 265, 98 S.Ct. 2733. As Mr. Justice Powell put it for the majority:
 
 
 6
 When a classification denies an individual opportunities or benefits enjoyed by others Solely because of his race or ethnic background, it must be regarded as suspect. (Accent added.)
 
 
 7
 Id. at 305, 98 S.Ct. at 2756.
 
 I.
 
 8
 The permeating defect in the organization of CGC, the governing council, is the imposition of an artificial racial structure upon this elective body that bars non-minority students from eligibility for appointment to the Council. This resort to race affronts Bakke. Although the regulation in question seeks to provide "protective representation," its effect is to establish a racial classification, as it relies exclusively on race to preclude non-minority students from enjoying opportunities and benefits available to others. See id. 265, 98 S.Ct. 2733.
 
 
 9
 Aggravation of the incursion upon appellant-white students' rights becomes immediately apparent upon recalling that the CGC President picks additional minority students to satisfy the requisite racial composition without an election. Appellants are ineligible for appointment to the Council because they are not of a minority race. Furthermore, the presence of one or more unelected members on the Council dilutes the representative character of the legislative body. Students are entitled to the assurance that their legislature, established at a State institution, is entirely free from the taint of racial preference. Disenfranchisement because of race entrenches upon their Constitutional and statutory rights. Supra note 5.
 
 
 10
 In Bakke, Justice Powell reiterated "that in 'order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is "necessary . . . to the accomplishment" of its purpose or the safeguarding of its interest.' " (Citations omitted.) 438 U.S. at 305, 98 S.Ct. at 2756. Inclusion in the CGC of unelected Councillors is not indispensable to assure representation of minority students. As noted in Bakke :
 
 
 11
 Nothing in the Constitution supports the notion that individuals may be asked to suffer otherwise impermissible burdens in order to enhance the societal standing of their ethnic groups. . . . (P)referential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relationship to individual worth.
 
 
 12
 Id. at 298, 98 S.Ct. at 2753.
 
 II.
 
 13
 The Honor Court is, of course, for the trial of students accused of conduct dishonorable or otherwise hurtful to the student body, as well as to other pupils individually. It is in the nature of an intramural judicial tribunal of seven lay jurors or judges. Its organic regulation allows race to be a dominant consideration in impaneling the court, obviously a vital juncture in the trial process. This focus on race is achieved by permitting the defendant to insist that a majority of his triers be of his race. That such recourse to race would be a preposterous defiance of the Fourteenth Amendment and the Civil Rights Acts, Supra note 5, in a trial beyond the University walls needs no exposition. Its denial of equal protection within the academic community is no less clear, for there race may be invoked in a trial adjudging the character of a student.
 
 
 14
 Extending the choice of his judges' racial complexion to a student on trial for misconduct is a potential invasion both of the rights of the other students singly and as a body. They need the protection afforded by the court to prevent any injury to them which the particular defendant's offense might cause. The non-offenders' confidence in the Honor Court logically is diminished when they know that by regulation race may influence the court's judgment. Their position can be likened to the public's in a criminal prosecution, where the prosecution, like the defendant, is entitled to a jury not drawn with an eye to race.
 
 
 15
 The stern, sincere and unanimous desire for fairness, both in truth and in theory, cannot override the stubborn fact that the system adopted by the University perpetuates inequity instead, thus infringing upon the interests of all students. The just solution is to remove race altogether from the high court regulation, as the appellants pray. Otherwise, it will bar them of the assurances of equal treatment under the Constitution and laws of the United States. Supra note 5.
 
 III.
 
 16
 There is no justification for appellees' insistence that the cause be remanded to the District Court to take additional evidence that, they assert, reflects prior discrimination at the University, or depicts the regulations as an effort by the University to develop a "diverse student body" or to achieve other related aims. Bakke suggests that racial preferences may be approved upon the finding of a continuing Constitutional or statutory violation, as long as others are not prejudiced by the remedial course adopted. 438 U.S. at 265, 98 S.Ct. 2733. The method here chosen for eradicating possible earlier discrimination could not be accepted, even if history revealed such conduct, because, as we have seen, the supposedly remedial measures presently enforced impinge upon the rights of others.
 
 Conclusion
 
 17
 Finally, the University of North Carolina has failed to demonstrate that the accomplishment of the State's purpose necessitates its use of a suspect classification in the two student government regulations before us. Accordingly, summary judgment will go for the appellants, holding the regulations invalid, and, to that extent, reversing the judgment of the District Court.
 
 
 18
 Reversed with Summary Judgment.
 
 
 19
 WINTER, Circuit Judge, with whom HAYNSWORTH, Chief Judge, and BUTZNER, Circuit Judge, join, dissenting:
 
 
 20
 Because we think that faithful compliance with the mandate to reconsider this case in the light of Regents of University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), requires a remand to the district court for the taking of evidence and for findings of fact, we respectfully dissent. Additionally, we think that on remand the district court should make a determination as to whether the case is moot.
 
 I.
 
 21
 The majority, on an incomplete record as we shall show, invalidates two regulations. The first requires that the 18-member Campus Governing Council have "a protective representation of minority races and both sexes by being composed of at least two members of a minority race within the student body, two male members and two female members. If, as a result of student elections, these minimum requirements are not met, the president of the student body, with the consent of the council, shall appoint additional members, who have the same rights, privileges and duties as elected members, to satisfy the formula. From the present record, it appears that it has never been necessary that the power of appointment be exercised to meet the minimum requirements of minority racial representation.
 
 
 22
 The second is a guarantee that an accused required to appear before an Honor Court may, on his request, require that four of the seven judges of the Court be of his or her race or sex. It should be noted that this regulation is facially neutral both as to race and as to sex; the right to have a majority of the judges of the same race and sex as the accused extends to a student of either sex and of any race.
 
 
 23
 As we pointed out in our earlier dissent, the record before us contains some general discovery by way of requests for admissions, answers to interrogatories and production of documents. 558 F.2d at 728. But these disclosures fall well short of telling the whole story of the history of discrimination or non-discrimination at the university, the need for remedial measures, the reasonableness of the measures and how, in practice, they have operated. Short of such proof and findings of fact derived therefore, we do not think that this case can be properly decided.
 
 
 24
 Bakke does not hold that in all events racial criteria may not be the sole determinant in fixing the rights of students. True, Bakke recognizes that race is a suspect classification, but the significance of the classification is, as Mr. Justice Powell for the Court explains, only that the State, in order to sustain the validity of its use of the criterion, "must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary . . . to the accomplishment' of its purpose or the safeguarding of its interest." 438 U.S. at 305, 98 S.Ct. at 2756 (quoting from In re Griffiths, 413 U.S. 717, 722-23, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973)). Having reaffirmed that general principle, Mr. Justice Powell added, "(t)he State certainly has a legitimate and substantial interest in ameliorating, or eliminating where feasible, the disabling effects of identified discrimination." 438 U.S. at 307, 98 S.Ct. at 2757.* Of course, Mr. Justice Powell continued, the Court "has never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations." 438 U.S. at 307, 98 S.Ct. at 2757. But, "(a)fter such findings have been made, the governmental interest in preferring members of the injured groups at the expense of others is substantial since the legal rights of the victims must be vindicated." 438 U.S. at 307, 98 S.Ct. at 2758.
 
 
 25
 Contra to the views of the majority, we read Bakke both to recognize and to approve, as a general principle, the use of racial criteria in remedial steps to redress wrongs worked by adjudicated instances of racial discrimination, provided only that the remedial steps "work the least harm possible to other innocent persons competing for the benefit." 438 U.S. at 308, 98 S.Ct. at 2758. That is the very reason why we think this case should be remanded and a full trial conducted. The present record simply does not permit a firm conclusion as to the extent of discrimination at the University of North Carolina and the need for and efficacy of the present regulations. The majority's condemnation of the regulations because they impinge upon the rights of others is simplistic. Bakke teaches that as a necessary remedial measure a victimized group may be preferred at the expense of other innocent persons. What cries out for determination in the instant case is whether such preferment is justified under the principles of Bakke.
 
 II.
 
 26
 This litigation began on June 13, 1974 by plaintiffs then students at the University. They were joined by other students who sought to intervene on September 13, 1974, and whose intervention was allowed. Although the complaint sought certification for a class action, the district court did not act upon the request. Additional interventions were sought from us, and on April 18, 1978, we referred the motions to the district court. The present record does not disclose what action the district court took thereon.
 
 
 27
 The fact that even with scholastic success the period that a student is enrolled in a University is limited and the fact that, absent certification of a class, there have been repeated efforts to intervene in the litigation suggest to us the possibility that the litigation has become moot. Thus, it is quite possible that the action may have been mooted by the departure of all named plaintiffs from the University before other students sought intervention. If, in accord with our views, the case were remanded for trial on the merits, we would direct the district court first to consider if the case has become moot either because all named plaintiffs have severed their connection with the University, or at some stage of the proceedings no named plaintiff had maintained a continuing connection with the University.
 
 
 
 [1]
 Uzzell v. Friday, 558 F.2d 727 (4th Cir. 1977); Uzzell v. Friday, 547 F.2d 801 (4th Cir. 1977)
 
 
 [2]
 438 U.S. 912, 98 S.Ct. 3139, 57 L.Ed.2d 1158 (1978)
 
 
 [3]
 University of North Carolina Student Constitution art. I, § 1.D
 
 
 [4]
 The Instrument of Judicial Governance for the University of North Carolina at Chapel Hill art. IV, § E(2)(e)(2) reads as follows:
 e. Trial Courts
 2) If requested by the defendant, provision shall be made for racial or sexual representation (but not both) on the trial court, as follows:
 a) At least four of the seven members of the trial court shall be of the same sex as the defendant;
 b) When a defendant is not a member of the majority race, at least four of the seven members of the trial court shall not be of the majority race;
 c) When a defendant is a member of the majority race, at least four of the seven members of the trial court shall be of the majority race.
 5 U.S.Const. amend. XIV, § 1; Civil Rights Act of 1871, codified at 42 U.S.C. § 1983 (1970); and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.
 
 
 *
 After the mandate of the Supreme Court issued in the instant case, the University moved for a remand to the district court for a trial on the merits. After pointing out that the present record is not full and complete, the university tracked the language quoted in the text asking that it "be afforded an opportunity to present evidence of its 'legitimate and substantial interest in ameliorating, or eliminating where feasible, the disabling effects of identified discrimination.' " Indeed, it rightfully argued that procedural due process required that it be given this opportunity