383 So.2d 634 (1980)
Robert GRAHAM et al., Appellants,
v.
Gul T. RAMANI, Appellee.
No. 57076.
Supreme Court of Florida.
May 1, 1980.
Jim Smith, Atty. Gen., and Pamela L. Lutton and Martin S. Friedman, Asst. Attys. Gen., Tallahassee, for appellants.
Joel V. Lumer, Miami, for appellee.
ALDERMAN, Justice.
This is an appeal from an order of the trial court declaring unconstitutional that part of section 117.01, Florida Statutes *635 (1977),[1] requiring notaries public to be citizens of the United States. We affirm the trial court and hold that the citizenship requirement of section 117.01(1) violates the equal protection guarantee of the fourteenth amendment of the constitution of the United States.
Gul T. Ramani, a member of The Florida Bar and a resident alien, applied for a notary public commission pursuant to chapter 117 Florida Statutes (1977). His application was denied because he was not a citizen of the United States. He then filed a complaint asserting that this denial violated his right to equal protection of the laws. In reaching its decision, the trial court concluded that a notary public's duties are not discretionary and do not affect the state's constitutional responsibility for establishing and operating its own governmental and democratic political institutions and that the constitutionality of the citizenship requirement of section 117.01(1) is correctly measured by the strict scrutiny test. Seeking reversal of this decision, the State contends that the trial court should have used the rational relationship test instead of the strict scrutiny test and should have found a reasonable basis for this alienage-based classification.
To resolve this appeal, we must first determine the applicable constitutional standard. To make this determination, we look to the United States Supreme Court decisions dealing with aliens' rights.
It has been long settled that the term "person," in the context of the fourteenth amendment, encompasses lawfully admitted resident aliens as well as citizens of the United States and that the fourteenth amendment entitles both citizens and aliens to the equal protection of the laws of the state in which they reside. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).
In some early cases, however, the Supreme Court upheld state statutes that treated citizens and aliens differently, the ground for distinction being that such laws were necessary to protect special interests of the state or its citizens. For example, the Court upheld statutes that, in the absence of overriding treaties, limited the rights of non-citizens to engage in exploitation of a state's natural resources,[2] restricted the devolution of real property to aliens,[3] or denied to aliens the right to acquire land.[4]
But doubt was cast upon the continuing validity of the special public interest doctrine when, in 1948, the Court held that California's claim of ownership of ocean fish in its territorial waters was not such a special public interest as would justify the state's prohibiting aliens from making a living by fishing in those waters while permitting its citizens to do so. Takahashi v. Fish and Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). The vitality of the special interest doctrine in other contexts was further undercut when, in 1971, the Court held that a state may not condition welfare payments on United States citizenship. Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). It became clear from these decisions that the power of a state to apply its law exclusively to its alien inhabitants as a class is confined within narrow limits. Under traditional equal protection principles, a state retains broad discretion to classify as long as its classification has a reasonable basis, but classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny.
In 1973, the Court decided In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 *636 (1973). At issue was a Connecticut statute that prohibited aliens from taking the state bar examination. In accordance with this law, Griffiths, a Connecticut resident and a Netherlands citizen, was denied permission to sit for the examination. Connecticut defended the law, arguing that by statute a Connecticut lawyer is a public officer with authority to sign writs and subpoenas, take recognizances, administer oaths and take depositions and acknowledgments of deeds. Connecticut also argued that an alien might have a conflict of loyalty between the courts and clients in favor of a foreign nation. The Court rejected this argument and explained:
We find these arguments unconvincing. It in no way denigrates a lawyer's high responsibilities to observe that the powers "to sign writs and subpoenas, take recognizances, [and] administer oaths" hardly involve matters of state policy or acts of such unique responsibility as to entrust them only to citizens. Nor do we think that the practice of law offers meaningful opportunities adversely to affect the interest of the United States. Certainly ... [Connecticut] has failed to show the relevance of citizenship to any likelihood that a lawyer will fail to protect faithfully the interest of his clients.
413 U.S. at 724, 93 S.Ct. at 2856. The law was stricken as violative of the equal protection clause.
Griffiths becomes even more significant when it is read in conjunction with Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973). In Sugarman, which was decided on the same day as Griffiths, a New York statute forbade appointment of an alien to any competitive class civil service position. As a result, Dougall, an alien, was discharged from his job. He and others then brought a class action suit challenging the statute's constitutionality. The question before the court was "whether New York's flat statutory prohibition against the employment of aliens in the competitive classified civil service is constitutionally valid." 413 U.S. at 639, 93 S.Ct. at 2846. The Court said:
[I]n seeking to achieve this substantial purpose, [defining and limiting participation in the political community] with discrimination against aliens, the means the State employs must be precisely drawn in light of the acknowledged purpose.
In view of the breadth and imprecision of ... [the law] in the context of the State's interest, we conclude that the statute does not withstand close judicial scrutiny.
413 U.S. at 643, 93 S.Ct. at 2848. The Court concluded that the New York law violated equal protection, saying:
"[E]ach State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen." ... Such power inheres in the State by virtue of its obligation ... "to preserve the basic conception of a political community." ... And this power and responsibility of the State applies, not only to the qualifications of voters, but also to persons holding state elective or important nonelective executive, legislative, and judicial positions, for officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government. There ... is "where citizenship bears some rational relationship to the special demands of the particular position."
413 U.S. at 647, 93 S.Ct. at 2850 (emphasis added).
A similar result was reached in Nyquist v. Mauclet, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977). The issue there was whether New York could constitutionally bar certain resident aliens from state financial assistance for higher education. New York required that an applicant for educational financial assistance be a United States citizen or that he submit a statement affirming his intention to apply for citizenship as soon as he is eligible. Mauclet filed a statement indicating he intended to retain his French citizenship, and therefore his application for assistance was not processed. The Court said:

*637 [C]lassifications by a State that are based on alienage are "inherently suspect and subject to close judicial scrutiny." [Citations omitted.] In undertaking this scrutiny, "the governmental interest claimed to justify the discrimination is to be carefully examined in order to determine whether that interest is legitimate and substantial, and inquiry must be made whether the means adopted to achieve the goal are necessary and precisely drawn."
432 U.S. at 7, 97 S.Ct. at 2124. New York attempted to justify this limitation as an attempt to preserve its political community. The Court recognized that alienage may be considered in establishing and limiting participation in the state government but only when the official participates directly in the formulation, execution, or review of broad public policy. 432 U.S. at 11, 97 S.Ct. at 2126, citing Sugarman, 413 U.S. at 642, 93 S.Ct. at 2847.
In Foley v. Connelie, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978), another New York law provides an example of a valid restriction based on citizenship. Foley, who was a resident alien, claimed that a statute requiring state policemen to be United States citizens violated his equal protection rights. In analyzing that claim, the Court concluded that every restriction based on alienage need not be subjected to strict scrutiny. When the matter is within the state's constitutional prerogatives, the state needs to show only a rational relationship between the interest sought to be protected and the limitation classification. Chief Justice Burger, speaking for the Court, said:
[I]t is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions. [Citation omitted.] Similar considerations support a legislative determination to exclude aliens from jury service. [Citation omitted.] Likewise, we have recognized that citizenship may be a relevant qualification for fulfulling those "important nonelective executive, legislative, and judicial positions," held by "officers who participate directly in the formulation, execution, or review of broad public policy." [Citation omitted.] This is not because our society seeks to reserve the better jobs to its members. Rather, it is because this country entrusts many of its most important policy responsibilities to these officers, the discretionary exercise of which can often more immediately affect the lives of citizens than even the ballot of a voter or the choice of a legislator. In sum, then, it represents the choice, and right, of the people to be governed by their citizen peers. To effectuate this result, we must necessarily examine each position in question to determine whether it involves discretionary decisionmaking, or execution of policy, which substantially affects members of the political community.
The essence of our holdings to date is that although we extend to aliens the right to education and public welfare along with the ability to earn a livelihood and engage in licensed professions, the right to govern is reserved to citizens.
435 U.S. at 296-97, 98 S.Ct. at 1070-1071. The Court then examined the functions of police and determined that they are fundamental obligations of a government to its constituency. "The execution of the broad powers vested in them affects members of the public significantly and often in the most sensitive areas of daily life." 435 U.S. at 297, 98 S.Ct. at 1071. It went on to say:
Clearly the exercise of police authority calls for a very high degree of judgment and discretion, the abuse or misuse of which can have serious impact on individuals... . A policeman vested with ... discretionary powers ... is not to be equated with a private person engaged in routine public employment or other "common occupations of the community" who exercises no broad power over people generally... .
435 U.S. at 298-99, 98 S.Ct. at 1072 (emphasis added). The law was upheld.
Another example of a valid restriction based on citizenship is found in Ambach v. *638 Norwick, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979). At issue was a New York statute forbidding certification as a public schoolteacher of any person who is not a citizen of the United States unless that person has manifested an intention to apply for citizenship. The Court concluded that some state functions are so bound up with the operation of the state as a governmental entity so as to permit the exclusion from those functions all persons who have not become a part of the process of self-government, and thus the state is required to justify exclusion of aliens from such governmental positions only by showing some rational relationship between the interest sought to be protected and the limiting classification. The Court then considered the role of public education and the degree of responsibility and discretion teachers possess in fulfilling that role. The manner in which a teacher daily exercises this discretion can influence a student's attitude toward government and the political process. The Court found that since public schoolteachers may be regarded as performing a task that goes to the heart of representative government, the law requires only that a citizenship requirement applicable to teaching in the public school bear a rational relationship to a legitimate state interest. Applying the rational relationship test, the Court held that the law was constitutionally valid.
The applicable law can thus be summarized: The equal protection clause protects aliens as well as citizens. Classifications based on alienage are inherently suspect and generally subject to strict judicial scrutiny; however, if the limitation is against alien participation in public offices that formulate, execute, or review broad public policy or other functions that exercise discretion and go to the heart of representative government, a state need show only some rational relationship between the interest sought to be protected and the limiting classification.
We conclude that the trial court correctly determined that Florida's statutory limitation against aliens being notaries public is subject to strict judicial scrutiny and that the State has failed to meet this test.[5] We recognize the State's constitutional prerogative to define who is eligible to govern and who is not, but a notary public's duties do not involve governing. Nor are they so bound up in the State's governing function that an alien can constitutionally be excluded from the position. The duties of a notary public, prescribed by chapter 117, Florida Statutes (1977), include acknowledging written instruments, solemnizing marriages and taking renunciations of dower, protesting papers necessary to be protested. Attending at a demand, tender or deposit and noting the same, executing certificates, executing orders for survey, copying papers necessary to be copied, and administering oaths and making certificates thereof. None of these duties entail formulating, executing, or reviewing public policy, or other functions that go to the heart of representative government. Instead, the notary public functions are more of the nature of routine public employment. In re Griffiths.
Accordingly, we affirm the trial court and hold that the citizenship requirement of section 117.01(1), Florida Statutes (1977), violates the equal protection guarantee of the fourteenth amendment.
It is so ordered.
ENGLAND, C.J., and BOYD and SUNDBERG, JJ., concur.
ADKINS, OVERTON and McDONALD, JJ., dissent.
NOTES
[1] Section 117.01(1), Florida Statutes (1977), provides:

The Governor may appoint as many notaries public as he shall deem necessary, each of whom shall be at least 18 years of age, a citizen of the United States, and a permanent resident of the state.
[2] McCready v. Virginia, 94 U.S. (4 Otto) 391, 24 L.Ed. 248 (1877).
[3] Hauenstein v. Lynham, 100 U.S. 483, 25 L.Ed. 628 (1880).
[4] Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255 (1923).
[5] The same conclusion was reached by two federal district courts where resident aliens challenged state requirements that notaries public be United States citizens. The district courts in each case concluded that the various functions of a notary public are largely ministerial in nature and each declared the state law in question unconstitutional. Cheng v. Illinois, 438 F. Supp. 917 (D.Ill. 1977); Taggart v. Mandel, 391 F. Supp. 733 (D.Md. 1975).