Angelo A. GUARINO, Honorable, Senior Judge of the Philadelphia Court of Common Pleas

v.

Hon. Rolf LARSEN, Justice of the Supreme Court of PA; Hon. Nicholas P. Papadakos, Justice of the Supreme Court of PA; Hon. Ralph J. Cappy, Justice of the Supreme Court of PA; Hon. Robert N.C. Nix, Jr., Chief Justice of the Supreme Court of PA; Hon. John P. Flaherty, Justice of the Supreme Court of PA; Hon. Frank J. Montemuro, Jr., Justice of the Supreme Court of PA; Hon. Stephen A. Zappala, Justice of the Supreme Court of PA; Nancy M. Sobolevitch, Administrator of the Office of Pennsylvania Courts; Administrative Office of Pennsylvania Courts, Appellants.

No. 93–1365.

United States Court of Appeals, Third Circuit.

Argued Aug. 31, 1993.

Decided Nov. 30, 1993.

Order Denying Rehearing and Rehearing In Banc Dec. 29, 1993.

Arlin M. Adams (argued) and Charles C. Hileman, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for appellants.

Harry Lore (argued), Philadelphia, PA, for appellees.

Before: BECKER, NYGAARD and ALITO, Circuit Judges.

## OPINION OF THE COURT

BECKER; Circuit Judge.

This is an appeal by the Justices of the Supreme Court of Pennsylvania and their statewide court administrator Nancy M. Sobolevitch from an injunction issued against them by the district court for the Eastern District of Pennsylvania. The order required these defendants to reinstate the plaintiff Angelo A. Guarino, a retired judge of the Court of Common Pleas of Philadelphia County, to the status of senior judge, and mandated that they refrain from refusing Judge Guarino future judicial assignments on account of certain practices that he had utilized in dealing with perceived recalcitrant jurors. Judge Guarino had sued the justices and Ms. Sobolevitch in the same district court under 42 U.S.C. § 1983, alleging that they had unconstitutionally infringed both his property right in continuing to perform judicial duties and his liberty interest in his reputation which, he says, the justices impugned by the manner in which they "removed him" from office on November 10, 1992.

Because the removal was effected peremptorily, without a hearing, and not by what he believes to be the only permissible procedure under Pennsylvania law for removal of a judge, i.e., proceedings before the Judicial Inquiry and Review Board (JIRB), Judge Guarino alleges that he was deprived of due process of law under the Fourteenth Amendment. The district court, rejecting challenges to its subject matter jurisdiction, and also the contention that it was obliged to abstain under the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d

669 (1971), agreed with Judge Guarino. Accordingly, it entered the injunction which is challenged on this appeal.

Focusing our attention on the hierarchial administrative structure of the Pennsylvania court system under the Judicial Article of the Pennsylvania Constitution, the defendants point to the absolute right of the justices to assign or not assign any retired judge to senior judge duties for any reason (or for that matter no reason, absent an invidiously discriminatory one). As a result, they submit that the notion that Judge Guarino had a property interest in sitting as a judge is fanciful. They also contend that they did not infringe his liberty interest in his reputation, observing that they had publicly lauded Judge Guarino for his dedicated service to the judiciary, and that any putative damage to his reputation had been effected by media publicity over which they had no control. Additionally, they argue that Judge Guarino was not removed as that term is used in proceedings before the JIRB. These arguments are most persuasive, and we are strongly tempted to reach the merits and dispatch the case on these grounds.

The lower federal courts are, however, courts of limited jurisdiction, sometimes even over federal constitutional matters, and we are obliged to examine our jurisdiction before making merits determinations. On this issue we are satisfied that the so-called *Rooker–Feldman* doctrine deprived the district court (and us) of jurisdiction over this matter for, under that doctrine and under the facts, Judge Guarino's sole recourse was to the United States Supreme Court.

The applicability of *Rooker–Feldman* depends upon the Pennsylvania Supreme Court having acted in an adjudicative rather than in an administrative capacity in revoking Judge Guarino's senior judge assignment. At first blush it seems counter-intuitive to assert that the court acted in an adjudicative manner, since the court's initial action in abrogating Judge Guarino's assignment was made pursuant to its veritable absolute power of superintendence over the Pennsylvania judiciary to which we have referred. The matter is complicated, however, by the fact that on February 26, 1993, the court served upon

Judge Guarino an order to show cause at a March hearing why it should change its decision to revoke his assignment. Judge Guarino declined to appear at that hearing, proceeding instead with his previously filed federal court action, a decision apparently animated by a prior decision of this court suggesting that an appearance before the Pennsylvania Supreme Court would undermine the jurisdictional basis for his federal action. On March 10th, the Pennsylvania Supreme Court issued an order reaffirming its November decision after finding that Judge Guarino had no property right in his position.

We hold that, while the November 10, 1992, order revoking Judge Guarino's assignment was not adjudicative in and of itself, the March order which reached conclusions of law converted the actions of the justices into an adjudication, interposing *Rooker–Feldman* as a jurisdictional bar to Judge Guarino's federal court action. While the March order did not specifically address Judge Guarino's constitutional claims, it did in essence decide his property-based due process claim by deciding that he had no property right to his position. Moreover, Judge Guarino waived his liberty-based due process claim by failing to attempt to present this claim to the Pennsylvania Supreme Court. The other requisites of *Rooker–Feldman* not being in dispute, we will vacate the order of the district court and remand the case to the district court with instructions to dismiss it for lack of subject matter jurisdiction.

## I. FACTS AND PROCEDURAL HISTORY

### A. *Background Facts*

After serving for seventeen years on the Philadelphia Court of Common Pleas, Judge Guarino retired upon his 70th birthday as required by the Pennsylvania Constitution, Article V, Section 16(b). He then applied for designation as a senior judge. After defendant Sobolevitch, Court Administrator of the Administrative Office of the Pennsylvania Courts, certified that he met the requirements for senior status under Rule 701 of the Pennsylvania Rules of Judicial Administration, the Pennsylvania Supreme Court desig-

nated him with that status. The court assigned Judge Guarino for a one month term beginning on March 24, 1991, and renewed that assignment for each month through November of 1992. The only exception was a ten day period in April of 1992.

It is undisputed that the court delayed renewal of Judge Guarino's assignment for that ten day period in April 1992 as a result of its concerns about a class action suit that had been filed on March 19, 1982, against Judge Guarino in the United States District Court for the Eastern District of Pennsylvania. (Testimony of Nancy Sobolevitch, A–100, 101). The named plaintiffs in *Levy v. Guarino*, Civil Action No. 92–1609, included two persons who Judge Guarino thought had attempted to avoid jury duty by giving false answers during *voir dire*. As punishment, Judge Guarino had required these venirepersons to return to the courtroom for an additional day as a form of alternate service. The two venirepersons, who sued on behalf of a class of persons who would be present in future jury venires before Judge Guarino, asserted that Judge Guarino had violated their First, Fourth and Fourteenth Amendment rights.

On April 8, 1992, the parties entered into a stipulation pursuant to which Judge Guarino promised not to require venirepersons who had not been selected for a jury to return to his courtroom nor to punish venirepersons without due process of law. The venirepersons then withdrew their motion for a preliminary injunction. On August 4 and 14, 1992, Judge Guarino filed two supplementary statements with the district court, enumerating the procedures he would use if he thought that a venireperson was attempting to avoid jury service by providing false answers at voir dire. Judge Guarino represented that he would inform such a venireperson that his or her answers constituted a refusal to serve and that a refusal to serve was punishable as contempt of court. He would then give the individual a chance to respond; if after this response Judge Guarino determined beyond a reasonable doubt that the individual was engaged in misconduct intended to, and actually having the effect of, obstructing the administration of justice, he would make a finding of contempt on the record.

Nonetheless, on October 22, 1992, Judge Guarino held a venireperson in contempt after a colloquy in which she repeatedly stated that she had moral difficulties with passing judgment on another. On November 5, 1992, the *Levy* plaintiffs moved to re-open their motion for a preliminary injunction, alleging that by taking this action, Judge Guarino had violated the stipulation. He denied violating the agreement. The dispute remained unresolved when the Pennsylvania Supreme Court took the action against Judge Guarino that forms the basis for this appeal.

B. *The Pennsylvania Supreme Court's Action*

On November 10, 1992, while Judge Guarino was in the midst of a criminal trial, Judge Alexander Bonavitacola, Administrative Judge of the Trial Division of the Court of Common Pleas, entered Judge Guarino's courtroom and requested that he call a recess. Judge Bonavitacola then delivered to Judge Guarino an order that he had just received which was signed "BY THE [PENNSYLVANIA SUPREME] COURT." The order stated:

> [T]he Order ... assigning the Honorable Angelo Guarino to the Philadelphia Court of Common Pleas for the period of November 1, 1992, to November 30, 1992, is hereby revoked. Judge Guarino is not authorized to complete unfinished business pending before him with regard to his assignment for the above period as provided by Pa.R.Jud.Adm. 701(f).

Since issuance of the order Judge Guarino has not been reassigned to sit as a judge, and his pending cases have been reassigned to other judges.

The order resulted in a significant amount of publicity. Although the order did not specify the grounds for revocation of Judge Guarino's assignment, newspaper articles suggested that the Pennsylvania Supreme Court was acting in response to Judge Guarino's "mistreat[ment]" of potential jurors. On February 11, 1983, Judge Guarino, who felt "completely disgrace[d]" by the order, filed suit in the district court against the Justices and Ms. Sobolevitch. His complaint alleged

that the Supreme Court's November, 1992 order deprived him of his liberty and property without due process in violation of the United States Constitution. He requested a declaratory judgment, compensatory damages, and an injunction requiring the defendants to assign him as a senior judge on active status. The district court set the matter for hearing on March 11, 1993.

In the interim, on February 26, 1993, the Pennsylvania Supreme Court issued an order directing Judge Guarino to appear before the Supreme Court on March 9 to "show cause why the order entered on November 10 ... should not remain in full force and effect." However, Judge Guarino's counsel advised the Court by letter that neither he nor Judge Guarino would appear at the hearing and neither appeared. Thus, on March 10, the Court entered a per curiam order affirming its November order. In justifying its order, the court pointed to the *Levy* action, and recited that "[t]he temporary assignment of a retired judge to judicial service is a matter solely within the discretion of this Court, and any such assignment may be revoked for any reason at this Court's discretion." The court also stated that by virtue of the March 9th hearing it had "afforded Judge Guarino [an] opportunity to present all the facts, legal contentions and other considerations he deem[ed] appropriate and relevant."

C. *The District Court's Decisions*

On March 11, 1993, defendants moved to dismiss Judge Guarino's complaint for lack of federal subject matter jurisdiction on the ground that the orders issued by the Pennsylvania Supreme Court constituted an adjudication of the state's highest court, and, as such, were reviewable only by the United States Supreme Court under 28 U.S.C. § 1257 and the *Rooker–Feldman* doctrine. The district court denied defendant's motion. After a hearing on the merits, the court explained in an April 16, 1993 opinion that the Pennsylvania Supreme Court's actions had been administrative rather than adjudicative so that the *Rooker–Feldman* doctrine was inapplicable. The district court reasoned that: 1) the Pennsylvania Supreme Court had acted on its own initiative; 2) there was no action pending before any state

court when the order was issued; 3) the Pennsylvania Supreme Court had acted using discretion without applying any law and without finding any facts; and 4) the orders issued by the court were docketed as administrative matters. *See Guarino v. Larsen,* 821 F.Supp. 1040, 1050–51 (E.D.Pa.1993).

In a later decision denying defendants' motion for a stay of its injunctive order, the district court rejected defendants' second jurisdictional claim—that the court should have abstained based on *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The court's decision was grounded on the conclusion that by the time Judge Guarino filed his federal suit, he had already been deprived of his constitutionally protected liberty and property interests, and that he had been given no opportunity to raise his constitutional challenges in an ongoing judicial proceeding.

Regarding the merits of Judge Guarino's complaint, the district court suggested in its April 16th opinion that, aside from impeachment, Article V, Section 18 of the Constitution of Pennsylvania, establishing a Judicial Inquiry and Review Board ("JIRB") to investigate complaints against judges and to recommend to the Pennsylvania Supreme Court an appropriate course of action with regard to those complaints, provides the only procedure under Pennsylvania law for the removal of judges, senior or otherwise. *See id.* at 1051. The district court went on to suggest that Judge Guarino had been "removed" and that the removal had not followed the procedures prescribed in § 18 of the Constitution of Pennsylvania. *See id.* at 1052–54. However, the court refrained from making a definitive ruling on the meaning of Pennsylvania law, because it found that the United States Constitution supported Judge Guarino's claims. *See id.* at 1054.

At the threshold, the district court held that by the terms of his assignment, Judge Guarino had acquired a property right to be assigned from November 1 through November 30, 1992, and through the completion of his lengthy case list. *See id.* at 1055–57. The court added that this right was established not only by the terms of the assignment, but also by the Pennsylvania Constitu-

tion which provides an explicit set of procedures to suspend, remove or discipline judges. Moreover, it continued, Judge Guarino had a property right in future assignments, because no retired judge who had applied for and was eligible for senior status had ever been denied it, and there remained a need for Judge Guarino's services.

The court went on to hold that under *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 547, 105 S.Ct. 1487, 1496, 84 L.Ed.2d 494 (1985), "an employee with a property interest in his or her job is entitled to a *pretermination* opportunity to respond to charges coupled with post-termination procedures" *Id.* at 1056 (emphasis added). It reasoned that the Pennsylvania Supreme Court had violated Judge Guarino's property rights by revoking his commission without providing any pretermination hearing. *See id.* at 1057–58. Moreover, according to the District Court, the Pennsylvania Supreme Court had provided an inadequate post-termination hearing—one in which it gave no explanation of the charges nor any explanation of the evidence it was considering. *See id.* at 1056.

The district court also held that the defendants had violated Judge Guarino's constitutionally protected liberty interest by defaming him. Citing *Paul v. Davis,* 424 U.S. 693, 708–09, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976), the court explained that in order for defamation by state officials to violate a constitutionally protected liberty it must come in the course of deprivation of a property right. *See Guarino,* 821 F.Supp. at 1058. In the court's view, by publicly removing Judge Guarino from the bench in a manner previously· employed only to remove a judge who was being investigated for accepting a bribe, defendants had shamed Judge Guarino and damaged his reputation in an effort to punish him for the actions at issue in the *Levy* case. *See id.* at 1058–59. The district court concluded that, by so damaging Judge Guarino's reputation in the course of eliminating his property right and by failing to give him an adequate opportunity to clear his name, defendants had deprived Judge Guarino of his constitutionally protected liberty interest without due process of law. *See id.* at 1059.

Based on its findings of constitutional violations, the district court entered an injunctive order requiring defendants "to reinstate Judge Guarino to the status of senior judge." *Id.* at 1059. The court also required defendants to refrain from denying:

> approval of subsequent assignments of Judge Guarino ... on the basis of allegations that he has violated the constitutional rights of venirepersons during voir dire unless and until the allegations have been referred to the JIRB pursuant to Article V, Section 18 of the Pennsylvania Constitution; and until the Pennsylvania Supreme Court has received the recommendation of the JIRB and has evaluated de novo the findings of the JIRB.

*Id.* at 1059–60. Turning to the issue of damages, the district court concluded that all defendants had absolute immunity, and hence no damages were recoverable; the court, however, did award reasonable attorneys' fees under 42 U.S.C. § 1988. *Id.* at 1059–60.

On April 19, 1993, defendants moved to stay the injunction. The district court denied the motion, but on May 7, 1993, a motions panel of this Court stayed the injunction pending appeal. This appeal followed.

## II. ROOKER–FELDMAN

■ Defendants' threshold argument is that the district court lacked jurisdiction under the *Rooker–Feldman* doctrine. Under this doctrine, "federal district courts lack subject matter jurisdiction to review final adjudications of a state's highest court or to evaluate constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.'" *Blake v. Papadakos,* 953 F.2d 68, 71 (3d Cir.1992) (quoting *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 483 n. 16, 103 S.Ct. 1303, 1315 n. 16, 75 L.Ed.2d 206 (1983)); *see also Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 414, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923). District courts lack subject matter jurisdiction once a state court has adjudicated an issue because Congress has conferred only original jurisdiction not appel-

late jurisdiction on the district courts. See *Rooker*, 263 U.S. at 416, 44 S.Ct. at 150.

■ In addition to this formal justification for the *Rooker–Feldman* doctrine, several policies also justify the doctrine. As with *Younger* abstention, which requires federal courts to abstain when there is a pending state court proceeding, *see Younger v. Harris*, 401 U.S. 37, 41–42, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971), part of the justification for *Rooker–Feldman* is respect for state courts.[1] Just as federal district courts should presume that pending state court proceedings can correctly resolve federal questions, they should also presume that completed state court proceedings have correctly resolved these questions.

A second justification for *Rooker–Feldman* stems from its similarity to claim preclusion. *See Valenti v. Mitchell*, 962 F.2d 288, 296 (3d Cir.1992). Like claim preclusion, *Rooker–Feldman* is partly concerned with finality, with ensuring that litigants do not take multiple bites from the same apple. Once litigants' claims have been adjudicated in the state court system, they should not also have access to the entire federal court system.

■ Since the other requisites of *Rooker–Feldman*, that the action at issue has been taken by a state court and that the action is final, are plainly met, its application in this case turns on whether any action of the Pennsylvania Supreme Court amounted to an adjudicative act. The Supreme Court has explained that "[a] judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." *See Feldman*, 460 U.S. at 477, 103 S.Ct. at 1312 (quoting *Prentis v. Atlantic Coast Line*, 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908)).[2] In contrast, non-adjudicative or administrative acts include two types. "Legislation ... looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." *Id.* Ministerial acts, although not precisely defined by the Supreme Court, are acts taken with respect to particular individuals based on the preferences of the actor; they do not involve application of preferences inscribed in existing law; nor do they involve the creation of a rule that will apply in the future. While the

---

1. *Younger* itself does not apply to this case because the state proceedings were completed by the time the district court took action on the merits—there was no *pending* state proceeding that the district court enjoined. The Pennsylvania Supreme Court had issued its March 10 order *before* the federal district court had even held its hearing on the merits. The United States Supreme Court has never applied *Younger* in such a situation. In *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 609–10, 95 S.Ct. 1200, 1210, 43 L.Ed.2d 482 (1975), the Court did apply *Younger* to a state judgment that already had become final, but it did so because the reason for the judgment's finality was that the federal appellee had failed to appeal the original state court judgment within the state court system. The *Huffman* Court feared that if it refrained from applying *Younger* whenever litigants chose not to appeal in state courts, litigants would then have an incentive to refrain from appealing in state court so that they could to turn to federal court. This reasoning is instructive here. *See infra* pp. 1161–62.

This case, however, differs from *Huffman*, in that the state's *highest* court already had reached its judgment by the time of the district court's hearing. Judge Guarino had no state remedies that he could have pursued which he failed to pursue. Of course, he could have appeared at

the March show cause hearing. But this affected only the outcome of that hearing, not whether there would be a hearing; the Pennsylvania Supreme Court made its final determination even without Judge Guarino's presence. Thus, there is no need to apply *Younger* here in order to ensure that the state court system has an opportunity to completely adjudicate an issue before it reaches federal court.

2. Under this criterion, a novel legal decision can still be adjudicative. Even though courts sometimes make new law, the requirement that an adjudicative decision "investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist," 460 U.S. at 477, 103 S.Ct. at 1312 (quoting *Prentis v. Atlantic Coast Line* 211 U.S. at 226, 29 S.Ct. at 69), does not mean that novel decisions are non-adjudicative. When a court makes a novel legal decision, it attempts to arrive at that decision by reasoning from existing legal materials. The court is making an attempt "to say what the law is." *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). In contrast, while an administrative actor may feel bound to operate within the boundaries of the law, that actor makes a decision based on personal preferences with no attempt and often no authority to establish that existing law requires a particular outcome.

Court has denied that the state supreme court's actions in *Feldman* were ministerial acts similar to the appointment of a clerk or a bailiff, it did accept the existence of such a category of acts. *See id.* 460 U.S. at 477, 479, 103 S.Ct. at 1312, 1313.[3]

Therefore, if the Pennsylvania Supreme Court decided to revoke Judge Guarino's assignment because it decided that he had violated formal legal criteria for which the prescribed punishment was revocation, then that decision would be adjudicative. If, on the other hand, the court revoked the assignment because of its own reasons which were not prescribed by any law, then that part of its decision would instead be ministerial.

Nonetheless, even if the court acted in a ministerial capacity, the decision might still have been adjudicative in part. If the court considered whether its own ministerial decision infringed constitutional rights, then that part of its decision might have been adjudicative, for the court would then have been applying existing constitutional law to the facts of its own ministerial decision. For example, if a state supreme court, with final authority on questions of state law, fired a clerical employee based on that employee's work performance and at the same time determined that its decision was legal under state contract law, the latter decision might be adjudicative. There are difficulties, however, in concluding that such an action is adjudicative—which we will discuss in some detail later in the opinion.

A. *The Pennsylvania Supreme Court's November Order*

■ Defendants argue that the November 10 order was adjudicative because: (1) it applied the laws giving the Pennsylvania Supreme Court administrative authority over state courts; (2) it applied those laws solely to Judge Guarino; and (3) it did not look to the future to change existing conditions. This argument, however, misconstrues the nature of adjudication. First, the November 10 order was issued under the powers granted to the supreme court to administer the state courts; it was not an attempt to con-

strue the meaning of those laws and to apply them to particular facts. If an action becomes adjudicative merely because the body taking the action has been given power to act by law, then all actions taken under color of that power would be automatically adjudicative. A supreme court decision to fire its reporter would then become an adjudicative act, which it plainly is not. Similarly, the initial order at issue in *Blake v. Papadakos*, 953 F.2d at 69, the order issued by the Pennsylvania Supreme Court which effectively limited the authority of the President Judge of the Philadelphia County Court of Common Pleas, would have been considered an adjudicative act. Yet, we indicated that the initial order in *Blake* was not adjudicative. *See Blake*, 953 F.2d at 73. Thus, the November order was not adjudicative simply because it was issued under the authority of state law.

Second, the Pennsylvania Supreme Court did not apply any other laws in issuing its November order. The court did not gather evidence, nor did it ask for any arguments as to whether Judge Guarino had violated some legal condition of his assignment. Moreover, the court did not review the constitutionality of its mode of decisionmaking—it did not provide any opportunity for constitutional argument, nor did it make any constitutional ruling.

■ While receiving written and oral submissions, gathering evidence and engaging in detailed legal analysis are not prerequisites of an adjudication, they provide evidence that a court has considered legal issues and reached a decision about what the law is. Although the District of Columbia Court of Appeals in *Feldman* performed none of these activities, there was other evidence that the court had made legal determinations before issuing its orders. When that court made its decisions in *Feldman*, it was not acting at its own initiative but rather was presented by appellants with claims of right that had already been presented to and rejected by the Committee on Admissions of the District of

---

**3.** The Court has not explicitly explained the relationship between administrative acts, legislative acts and ministerial acts. But administrative acts seem to be a broad category that encompasses both legislative acts and ministerial acts.

Columbia Bar. Thus, in rejecting appellants' petitions, the District of Columbia Court of Appeals implicitly had to reject appellants' claims that they were legally entitled to admission to the bar under present laws. Similarly, in *In re Summers*, 325 U.S. 561, 568–69, 65 S.Ct. 1307, 1312, 89 L.Ed. 1795 (1945), the Court explained that, "[a] claim of a present right to admission to the bar of a state and a denial of that right is a controversy. When the claim is made in a state court and a denial of the right is made by judicial order, it is a case which may be reviewed ... in this Court." 325 U.S. at 568–69, 65 S.Ct. at 1312.

In November, Judge Guarino made no claim of right and the Pennsylvania Supreme Court did not deny any claim of right. There was simply no evidence to indicate that the court was applying existing laws to determine a claim of right. Rather, it simply revoked Judge Guarino's appointment for reasons of its own.

Defendants nonetheless assert that the November 10 order was judicial, because it did not look to the future to change existing conditions through the enactment of a new rule. Such a characterization, however, merely shows that the Pennsylvania Supreme Court's act was not legislative; it does not demonstrate that the act was judicial. An actor's decisions that are based on personal preferences rather than legal rules are not adjudicative decisions even if the preferences are about a particular individual and are related to matters that have occurred in the past. In all of the Supreme Court cases finding a proceeding to be adjudicative, the proceeding involved the application of exist-

ing rules. For example, in *Feldman* the state court was considering whether Feldman had met the legal requisites for admission to the bar, whether it should make an exception to those requisites based on ethical concerns, and whether the requisites were themselves constitutional. *See* 460 U.S. at 479–82, 103 S.Ct. at 1313–14. The absence of any similar application of laws in the Pennsylvania Supreme Court's November 10th order is fatal to the claim that that order, when considered in isolation, was judicial in nature.

## B. *The Court's March 1993 Order*

█ In its March 10, 1993 order, the Pennsylvania Supreme Court reached the *legal* conclusion that "[t]he temporary assignment of a retired judge to judicial service is a matter solely within the discretion of this Court, and any such assignment may be revoked for any reason at this Court's discretion." In our view, this order represents the culmination of the court's actions with respect to Judge Guarino, adjudicating Judge Guarino's legal claims and thus rendering the actions of the Pennsylvania Supreme Court unreviewable.

Although the court did not refer to precedent and provided no detailed rationale for its conclusions, neither did the District of Columbia Court of Appeals in *Feldman. See* 460 U.S. at 468, 472, 480–82, 103 S.Ct. at 1307, 1309, 1314. Thus, the March 10 order met the *Feldman/Blake* requirements for an adjudication—it applied Pennsylvania state law to determine that Judge Guarino had no property right in his job and no right to any removal process different from the one the court used in issuing its November order.[4]

---

**4.** It may be that if a court decides whether corporation X discriminated against one of its employees, the court is engaging in "judicial" action, but if the court considers whether *it* discriminated against one of *its* employees the court is acting in its ministerial capacity. Adjudication may require a controversy between two parties *other* than the body making the adjudicative decision. A similar argument is that when a court makes a decision concerning the legality of its own actions, it may be too biased to justify abstention by the federal courts even if its actions are considered adjudicative. *Cf. Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (refusing to abstain in the *Younger* context when the state forum deciding an issue was biased). However, a conclusion that *Rooker–*

*Feldman* is inapplicable when a state court has made a decision with respect to the legality of its own actions is in significant tension with *Feldman* in which the District of Columbia Court of Appeals was acting as chief administrator of the bar admission process but was nonetheless held to have adjudicated the legality of particular decisions within that process. But *Feldman* may be distinguishable on a variety of grounds which we refrain from discussing here. Because Judge Guarino did not raise the issue, we do not need to decide whether *Rooker–Feldman* applies to decisions by a state court with respect to the legality of the court's own actions. We assume for the sake of this case that *Rooker–Feldman*

The Pennsylvania Supreme Court did not specifically address or decide Judge Guarino's constitutional claims. Neither did the *Feldman* Court refer to each of Feldman's specific claims when it issued its per curiam order. But whereas Feldman had raised his legal claims in a petition to the court and the court had issued an overarching decision denying Feldman's admission to the bar and thus implicitly denying all of his legal claims, Judge Guarino raised no legal claims before the Pennsylvania Supreme Court and thus the Court did not inherently have to consider and decide Judge Guarino's constitutional claims. Hence, the fact that the Pennsylvania Supreme Court reached an ultimate conclusion with respect to the revocation of Judge Guarino's assignment to senior judge status does not necessarily mean that it adjudicated his constitutional claims.

Yet while the Pennsylvania Supreme Court did not specifically address Judge Guarino's constitutional claims, by deciding that revocation of his assignment was solely within its discretion, the court decided that he had no property right to senior judge status under state law and in essence decided that its November order did not deprive Judge Guarino of "property" without due process of law. Because Judge Guarino's claim that he was deprived of property without due process of law was "inextricably intertwined" with his state law claim that he has a property right to his position, the March 10th order essentially constitutes an adjudication of that constitutional claim. See *Feldman*, 460 U.S. at 483 n. 16, 103 S.Ct. at 1315 n. 16.

■ But the Pennsylvania Supreme Court may very well not have adjudicated Judge Guarino's liberty based due process claim, because there is a strong argument that this claim is not inextricably tied to the state law issues explicitly decided by the Pennsylvania Supreme Court. However, we hold that Judge Guarino waived this claim by failing to present it at the March show cause hearing.

■ When a litigant expects that a court is willing to consider its legal claims, raises some of those claims, and has those claims

adjudicated, it makes sense to apply normal principles of claim preclusion to hold that the litigant has waived any legal claims he or she fails to raise which have arisen from the same transaction as those claims a litigant did raise. This is exactly the type of situation the Court was considering in n. 16 of *Feldman* when it indicated that "[b]y failing to raise his claims in state court a plaintiff may forfeit his right to obtain review of the state-court decision in any federal court." See *id.* at 482 n. 16, 103 S.Ct. at 1302 n. 16.

However, not all of the conditions alluded to above are present here. Before the supreme court issued its March order, there was little objective evidence that the court was willing to consider any of Judge Guarino's legal claims at all. On February 26, 1993, the court issued its order directing Judge Guarino to appear before it on March 9 to "show cause why the order entered on November 10 ... should not remain in full force and effect." This order is facially ambiguous. Because the March order was issued by the same body that had issued the initial administrative order, was docketed as an administrative proceeding, and did not reference any rule that Judge Guarino had allegedly violated, it could reasonably be interpreted merely as having offered Judge Guarino the opportunity to persuade the Pennsylvania Supreme Court why in fairness the court should exercise its administrative discretion differently.

On the other hand, the wording of the order is broad enough that it could be interpreted as having offered Judge Guarino the opportunity to argue that the earlier administrative action of the Pennsylvania Supreme Court had violated both Pennsylvania law *and* the United States Constitution. In other words, the order could be interpreted as having offered Judge Guarino an opportunity for full scale adjudication. Because no mandate in statute or court rule established such a hearing, and the hearing was, to our knowledge, a unique occurrence, the parties had no background information available at the time

*does apply and thus that Judge Guarino's claims*    *are barred.*

the order was issued to clear up the ambiguous wording of the order.[5] Thus, a reasonable person could easily have believed that the Pennsylvania Supreme Court had no inclination to decide legal issues at the March show cause hearing.

Moreover, unlike the litigant discussed in n. 16 of *Feldman*, Judge Guarino did not raise *any* legal claims before the state supreme court; thus, there is little evidence that Judge Guarino subjectively expected the state supreme court to adjudicate his legal claims. Given that Judge Guarino had no clear reason to believe that the Pennsylvania Supreme Court was willing to entertain either his state law claims or his constitutional claims, it is not immediately apparent why it makes sense to hold that Judge Guarino waived his constitutional claims by not raising them.

Nonetheless, we hold that Judge Guarino did waive his constitutional claims by failing to raise them, for he should have looked on the Pennsylvania Supreme Court's issuance of the show cause order as providing a chance for him to present his legal arguments even though it was not clear from the face of the order that such an opportunity would exist. When the "administrator" making a decision is a state supreme court and that state supreme court presents a litigant with an opportunity to present arguments to the court, it is reasonable for a party to expect that such a body will entertain constitutional challenges to its actions and to expect litigants to be on notice of this possibility, even if the state court seems to be acting in an administrative capacity.[6]

When a litigant fails to attempt to raise such claims, it is appropriate to presume that the state court would have been willing to decide his constitutional claims subject to rebuttal by clear evidence to the contrary. *Cf. Pennzoil Co. v. Texaco*, 481 U.S. 1, 15, 107 S.Ct. 1519, 1528, 95 L.Ed.2d 1 (1987) (holding that while *Younger* abstention is only justified if the pending state proceeding has the authority to adjudicate a litigant's federal claims, "when a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy in the absence of unambiguous authority to the contrary.")[7] Judge Guarino's uncertainty as to whether the Pennsylvania Supreme Court would have considered his constitutional claims is due solely to his own failure to attempt to raise those claims. A litigant suffers no real harm by attempting to raise his or her constitutional claim in state court: if the state court refuses to address the constitutional claim, the litigant can then raise the claim in federal court without any jurisdictional, abstention, or collateral estoppel problems. Requiring the litigant to attempt to raise those claims is relatively innocuous; we therefore hold that Judge Guarino waived his opportunity to ensure that the Pennsylvania Su-

---

**5.** In fact, we do have some evidence as to what the March hearing actually would have been about. In its March 10 order, the Pennsylvania Supreme Court stated that it had "afforded Judge Guarino [an] opportunity to present all the facts, legal contentions and other considerations he deem[ed] appropriate and relevant...." However, we decline to consider this evidence in assessing whether Judge Guarino waived his legal claims, because this evidence was not available to Judge Guarino at the time he decided not to attend the hearing.

**6.** Moreover, Judge Guarino arguably expected the show cause hearing to be an adjudicative one at which the Pennsylvania Supreme Court would come to a decision with respect to constitutional challenges. As Judge Guarino's counsel explained at oral argument, Judge Guarino refrained from attending the hearing precisely be-

cause he thought that by appearing and raising constitutional claims he would create *Rooker–Feldman* problems for himself. But *Rooker–Feldman* does not require that a litigant has actually attended a hearing—an adjudication can take place even absent (voluntary) inattendance.

**7.** Our holding only applies where a litigant has been summoned to participate in a state court proceeding or has voluntarily chosen a state forum for some of his or her claims. In such cases, a litigant must present all of his or her claims arising from the same transaction in order to avoid waiving those claims he or she does not raise. We are not asserting that a litigant who has an opportunity to choose between a state or federal forum to raise his or her initial claim must choose a state forum in order to avoid waiver.

**1162**

preme Court adjudicated all of his legal claims.[8]

## III. CONCLUSION

For the foregoing reasons, we conclude that the *Rooker–Feldman* doctrine applies with the result that the district court had no jurisdiction to consider this case. We will therefore vacate the order of the district court, and remand the case to the district court with instructions to dismiss for lack of subject matter jurisdiction.

NYGAARD, Circuit Judge, concurring.

Because the decision reached by the Pennsylvania Supreme Court is not within the boundaries we are entitled to patrol, I agree entirely with the majority's conclusion that the *Rooker–Feldman* doctrine applies with the result that the district court had no jurisdiction to consider this case. I write separately to briefly express my conclusion that the November 10th and March 10th orders are simply parts of one action by the Pennsylvania Supreme Court, which to me is clearly adjudicative.

Moreover, I disagree that the Pennsylvania Supreme Court's February 26th Show Cause order, directing Judge Guarino to appear before it on March 9th, is facially ambiguous. Under Pennsylvania procedure a Show Cause order is part of an adjudicative act, and I do not agree that a person such as Judge Guarino, well-schooled in the law, could have believed that the Pennsylvania Supreme Court had no inclination to decide the legal issues before it at the March show cause hearing. More importantly, he passed up the opportunity, afforded him in the order, to find out.

Hence, while I concur completely with the conclusion of the majority, I cannot join part IIA of its opinion, nor can I join part IIB except to the extent it concludes that Judge Guarino, by failing to appear at the Show Cause hearing convened on his behalf, waived his opportunity to insure that the Pennsylvania Supreme Court adjudicated all his legal claims.

Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and LEWIS, Circuit Judges.

## SUR PETITION FOR PANEL REHEARING WITH SUGGESTION FOR REHEARING IN BANC

Dec. 29, 1993.

The petition for rehearing filed by appellee, having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges in active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is DENIED.

---

**8.** Our holding that Judge Guarino waived his right to have the Pennsylvania Supreme Court decide all of his legal claims also resolves another potential problem with the applicability of *Rooker–Feldman* to the actions of the Pennsylvania Supreme Court. It may be that in addition to requiring that a state court apply existing law, adjudication demands that a litigant have some opportunity to present his claims to a state court. Since the United States Supreme Court is very unlikely to grant certiorari in any particular case, finding that an adjudication exists where the litigant has been unable to present his or her claim means that a litigant can lose on his claim without ever having had a chance to justify it to a court. Policy considerations such as these have led us to assert that *Rooker–Feldman,* like claim preclusion to which it has a near resemblance, only applies when litigants have had a *"full* and

fair opportunity to litigate their ... claim in state court." *See Valenti,* 962 F.2d at 296. However, such a conclusion is in substantial tension with *Feldman* in which a state court's action was held to be adjudicative even though the litigants only opportunity to present their claims was in their original petitions to the court. Here, we do not have to resolve the extent to which *Rooker–Feldman* requires that a litigant have had an opportunity to present his claim even though we have little actual knowledge as to what the nature of the March show cause hearing would have been had Judge Guarino appeared. Because Judge Guarino did not attempt to raise his claims when given a possible opportunity to do so, we presume that the Pennsylvania Supreme Court in fact gave him an opportunity to present his arguments which he then waived.