**Ian Bruce JOHNSON, Plaintiff,**

v.

**The STATE OF KANSAS, Kansas Supreme Court, Defendant.**

**No. 94–4149–SAC.**

United States District Court, D. Kansas.

April 18, 1995.

---

Michael F. Broemmel, Broemmel, Harris & Walters, Chtd., Topeka, KS, for plaintiff.

Carl A. Gallagher, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant's motions for summary judgment and dismissal (Dk. 12), the plaintiff's motion to strike and for partial judgment on the pleadings (Dk. 5), and the defendant's motion to strike affidavit of the plaintiff's counsel (Dk. 30). The plaintiff, Ian Bruce Johnson ("Johnson") filed this action alleging the defendant Kansas Supreme Court violated Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131, *et seq.*,[1]

---

1. Title II of the Americans with Disabilities Act prohibits public entities from discriminating against disabled persons. 42 U.S.C. § 12101 *et seq.* The specific prohibition is that "no quali-

fied individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be

when it denied his application to sit for the Kansas bar examination. Specifically, Johnson alleges that he is a qualified individual with a disability, namely chronic bipolar affective disorder, and that the Kansas Supreme Court denied his bar application because of his disability.

This case presents a unique amalgamation of motions. The parties submit materials beyond the pleadings without serious objection to the court's consideration of them. The exception is the defendant's motion to strike the plaintiff's counsel's Rule 56(f) affidavit. Based upon the court's decision, this exception and the motion are moot. Rather than belabor the order with the relevant standards for deciding each motion, the court will confine itself to the summary judgment standards. The court, however, has considered and weighed the arguments and authorities advanced in all the pending motions.

## SUMMARY JUDGMENT STANDARDS

■ A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsu-*

*shita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

■ The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case." *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The court views the evidence and draws any possible inferences in the light most favorable to the non-moving party. *MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115, 1117 (10th Cir.1991).

■ More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

subject to discrimination by such entity." 42 U.S.C. § 12132. A "public entity" is defined as "any department, agency ... or other instrumentality of a State ... government." 42 U.S.C. § 12131(1). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, ..., meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Pursuant to 42 U.S.C. § 12131(1), the Department of Justice promulgated regulations implementing the ADA, which include a definition for "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 28 C.F.R. § 35.104.

## STATEMENT OF UNCONTROVERTED FACTS

1. Johnson submitted a verified petition for admission to the Bar of Kansas to the Clerk for the Appellate Courts of Kansas on April 29, 1992. Johnson fully and accurately answered all questions required on the petition form. Johnson also submitted all requested information, including four sworn certificates of good moral character. In his petition or in connection with it, Johnson further established that he met the educational requirements set out in the Kansas Supreme Court's rules.

2. This was not the first time that Johnson applied to take a state bar examination. In fact, Johnson filed an application in Iowa on October 7, 1982, and another in Kansas on November 29, 1984. His application to take the Iowa bar was twice denied. As for his first Kansas application, it was deemed withdrawn when he failed to communicate with and appear before the Kansas Board of Law Examiners ("Board").

3. Johnson's 1992 application was forwarded to the Disciplinary Administrator of Kansas ("Disciplinary Administrator") for investigation. The Disciplinary Administrator requested from Johnson additional materials and reports about current treatment for any mental problems or treatment, including those that resulted in his prior criminal convictions, and additional reports and police information about his prior criminal cases. This material was furnished and gathered as requested. The material later was assembled and provided to the Board for its review.

4. In 1977, Johnson was charged with lewd and lascivious behavior. The charge was amended to assault and battery to which Johnson pleaded guilty. Johnson described this event as attempting to touch "the crotch of a 14–year–old girl on the street."

5. In 1982, there was another incident. Johnson entered a plea of guilty on a charge of assault "by poking female in the crotch while at the Iowa Memorial Union." As part of his application for deferred sentencing, Johnson asserted that he suffered from "Paraphilias," a sexual deviation disorder. John-son also presented an affidavit from his treating psychiatrist and psychologist which diagnosed plaintiff as suffering from "voyeurism." Johnson's request for deferred sentencing was granted.

6. Johnson later sought early discharge from the deferred sentencing and expungement of the criminal charge. To support his request, Johnson presented an affidavit from his psychiatrist describing the course of treatment for his disorder. His application for early discharge and expungement was granted.

7. As part of his application to take the bar examination in Iowa, Johnson provided an expert report from his psychiatrist diagnosing his disorder as a combination of "voyeurism and frottage."

8. Six months after applying to take the Kansas bar examination, Johnson pleaded guilty to misdemeanor sexual battery in Douglas County, Kansas, District Court, on May 30, 1985. Johnson was committed to Topeka State Hospital prior to sentencing. According to Johnson, the primary diagnosis of his condition by staff at Topeka State Hospital was "atypical sexual disorder." On November 22, 1985, Johnson was sentenced to one year in the county jail but paroled from that sentence. This conviction was expunged on February 10, 1992. Johnson has had no further incidents involving improper sexual behavior since 1985.

9. In response to the Disciplinary Administrator's request, Johnson furnished the Board with a psychiatric evaluation from Leonel A. Urdaneta, M.D. This psychiatrist diagnosed Johnson as suffering from "Bipolar Affective Disorder presently in remission." Dr. Urdaneta subsequently testified that this disorder presents with various symptoms at different points with one being "hypersexuality." Dr. Urdaneta also testified that recurrence of the bipolar disorder would be more likely when plaintiff was placed under stress. Dr. Urdaneta agreed that the practice of law was a stressful profession. Dr. Urdaneta testified that bipolar disorder is chronic and tends to worsen with age. Dr. Urdaneta indicated that Johnson was stable, reliable and in remission in that he did not present with any major symptoms

of his mental disorder. Dr. Urdaneta had not reviewed plaintiff's psychiatric records from the University of Iowa, Topeka State Hospital or the Menninger Foundation in diagnosing plaintiff's condition. Dr. Urdaneta also suggested that plaintiff was a high risk for recurrence with increased stress without treatment. Johnson has continued his treatment with Dr. Urdaneta from the date of his hearing before the Board to the present.

10. In the fall of 1989, the Disciplinary Administrator told Johnson that he believed the Kansas Supreme Court would not admit any applicant having a history of serious mental disorder, including plaintiff, unless that applicant could prove his or her condition to be "cured"—i.e., could present psychiatric expert testimony that the condition had been asymptomatic without treatment for at least two years and was, with reasonable medical certainty, expected to continue asymptomatic without treatment indefinitely in the future.

11. On August 28, 1992, in an attempt to encourage Johnson to withdraw his application without a hearing, the Administrator reiterated his belief that it is the Kansas Supreme Court's practice to require applicants who have a history of bipolar disorder to prove a "cure" as a prerequisite to admission.

12. At this same meeting on August 28, 1992, the Administrator also stated his belief that it is not within the authority of the Board of Law Examiners to recommend probationary admission of an applicant to the Kansas Bar.

13. Johnson did not submit to the Board a plan for supervision by a "supportive and experienced colleague" as suggested by Dr. Urdaneta. Johnson expected the Board and the Kansas Supreme Court to advise him of the conditions for admission and what type of probationary arrangements he could make for any required supervision and reporting. A principal with the law firm who presently employs Johnson as a legal assistant indicated that the firm would continue his employment as an assistant but would not employ him as an associate attorney. The principal explained that the firm did not need another

attorney, that Johnson was too timid, and that Johnson lacked certain social skills.

14. The Board recommended Johnson be denied permission to sit for the Kansas Bar Examination for failure to prove "requisite fitness and character" by clear and convincing evidence.

15. Johnson filed exceptions to the Board's report contending in part that the Board's recommendations violate the ADA.

16. The defendant Kansas Supreme Court accepted the Board's recommendations and denied permission to Johnson to sit for the bar.

17. Johnson sought reconsideration, again arguing the ADA prohibited denying him the opportunity to take the bar examination. The Kansas Supreme Court denied his motion for reconsideration.

18. Johnson petitioned for certiorari to the United States Supreme Court arguing in part that the Kansas Supreme Court violated Title II of the ADA. Defendant, through its attorneys, filed a brief in opposition contending the ADA was not applicable in plaintiff's case. The petition for certiorari was denied.

The defendant Kansas Supreme Court's principal argument is that Johnson's case is an improper collateral attack upon its decision denying his application to sit for the bar examination. For that reason, the defendant insists this court is without subject matter jurisdiction to review the particular application decision. Johnson counters that the jurisdiction properly lies under the ADA and the Bankruptcy Code. Alternatively, Johnson maintains he is not seeking judicial review of the Kansas Supreme Court's decision.

 It is an axiom that federal district courts exercise only original jurisdiction; they lack appellate jurisdiction to review state court decisions reached in judicial proceedings. *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 476, 103 S.Ct. 1303, 1311–12, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415–16, 44 S.Ct. 149, 150, 68 L.Ed. 362

(1923). The *Rooker*[2] and *Feldman* decisions have become known as the *Rooker–Feldman* doctrine. *Musslewhite v. State Bar of Texas,* 32 F.3d 942, 946 n. 11 (5th Cir.1994); *Fariello v. Campbell,* 860 F.Supp. 54, 65 (E.D.N.Y. 1994). In *Rooker,* the Court said that Congress, in enacting that section of the Judicial Code that is now found at 28 U.S.C. § 1257, had foreclosed federal courts, other than the Supreme Court, from reviewing final judgments of state courts. 263 U.S. at 416, 44 S.Ct. at 150. In effect, *Rooker* furnishes "an independent basis for prohibiting collateral attack on state court judgments." *U.S. Industries, Inc. v. Laborde,* 794 F.Supp. 454, 462 (D.Puerto Rico 1992). In *Feldman,* the Supreme Court extended that rule to a state court's final judgment in a bar admission matter.[3] Specifically, the Court in *Feldman* held that federal district courts do not have jurisdiction "over challenges to state-court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional." 460 U.S. at 486, 103 S.Ct. at 1317. The jurisdiction to review state appellate decisions resides exclusively with the Supreme Court. 460 U.S. at 486, 103 S.Ct. at 1317; *see ASARCO Inc. v. Kadish,* 490 U.S. 605, 622, 109 S.Ct. 2037, 2048, 104 L.Ed.2d 696 (1989) ("The *Rooker–Feldman* doctrine interprets 28 U.S.C. § 1257 as ordinarily barring direct review in the lower federal courts of a decision reached by the highest state court, for such authority is vested solely in this Court." (citations omitted)).

Besides the statutory appellate-original jurisdiction dichotomy underlying the *Rooker–Feldman* doctrine, courts have found other policies served by this doctrine. It maintains respect for state courts in much the same way as the abstention doctrine found in *Younger v. Harris,* 401 U.S. 37, 41–42, 91 S.Ct. 746, 749–750, 27 L.Ed.2d 669 (1971).[4] *Guarino v. Larsen,* 11 F.3d 1151, 1157 (3rd Cir.1993) ("Just as federal district courts should presume that pending state court proceedings can correctly resolve federal questions, they should also presume that completed state court proceedings have correctly resolved these questions."); *see Facio v. Jones,* 929 F.2d 541, 545 (10th Cir.1991) ("The *Feldman* rule is soundly and clearly based in the language of 28 U.S.C. § 1257 and in the public policy of federalism."); *De-Vargas v. Montoya,* 796 F.2d 1245, 1255

2. In *Rooker,* the plaintiff filed a federal suit to overturn a state court decision which had been affirmed by that state's highest court and which had been denied review by the United States Supreme Court. The federal district court dismissed the case for lack of subject matter jurisdiction, and the Supreme Court affirmed saying: "[N]o court of the United States other than this Court could entertain a proceeding to reverse or modify the judgment for errors of that character. To do so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the District Courts is strictly original." 263 U.S. at 416, 44 S.Ct. at 150.

3. In *Feldman,* the plaintiffs wanted waivers from the District of Columbia's rule that required all bar applicants to have degrees from accredited law schools. Unsuccessful in state court, the plaintiffs sued in federal court asserting constitutional right violations.

4. "The practice of law is not a matter of grace, but of right for one who is qualified by his learning and his moral character." *Baird v. State Bar of Arizona,* 401 U.S. 1, 8, 91 S.Ct. 702, 707, 27 L.Ed.2d 639 (1971). "A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law." *Schware v. Board of Bar Examiners,* 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957). In their protection of the public health and safety, states "have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 792, 95 S.Ct. 2004, 2016, 44 L.Ed.2d 572 (1975). "It is undisputed that a State has a constitutionally permissible and substantial interest in determining whether an applicant possesses 'the character and general fitness requisite for an attorney and counselor-at-law.'" *Application of Griffiths,* 413 U.S. 717, 722–23, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910 (1973) (quoting *Law Students Civil Rights Research Council v. Wadmond,* 401 U.S. 154, 159, 91 S.Ct. 720, 724, 725, 27 L.Ed.2d 749 (1971)). A state "has wide freedom to gauge on a case-by-case basis the fitness of an applicant to practice law." *Id.* 413 U.S. at 725, 93 S.Ct. at 2857. Federal courts have been "particularly chary of intrusion into the relationship between the state and those who seek license to practice in its courts." *Tang v. Appellate Division of the New York Supreme Court, First Dept.,* 487 F.2d 138, 143 (2nd Cir.1973), *cert. denied,* 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed.2d 111 (1974).

(10th Cir.1986) (As a matter of federal-state comity, the district court does not look behind the state court judgment), *overruled on other grounds, Newcomb v. Ingle,* 827 F.2d 675, 678 (10th Cir.1987); *Thomas v. Kadish,* 748 F.2d 276, 281 (5th Cir.1984) ("These controlling values [in *Feldman* ] include federal-state comity considerations and the 'strength of the state interest in regulating the state bar.' " (quoting *Feldman,* 460 U.S. at 483 n. 16, 103 S.Ct. at 1316 n. 16)), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985). It also provides a measure of finality and prevents multiple bites at the apple in much the same way as the claim preclusion doctrine. *Guarino,* 11 F.3d at 1157 ("Once litigants' claims have been adjudicated in the state court system, they should not also have access to the entire federal court system.")

■ Johnson's efforts to evade the *Rooker–Feldman* doctrine are not persuasive. Drawing upon the comprehensive mandate given in the ADA to eliminate discrimination on the basis of disability, Johnson argues that Congress intended to sweep the regulation of attorney licensure within the terms of the ADA. From this premise, Johnson leaps to the apparent conclusion that Congress also intended to bestow federal courts with jurisdiction to review all state courts' bar admission decisions upon allegations of disability discrimination. The court does not accept this logic and finds no authority for such a broad reading of the ADA.

"The only exception to ... the *Rooker–Feldman* doctrine, is where a federal statute authorizes federal appellate review of final state court decisions." *Fariello,* 860 F.Supp. at 65; *see Ritter v. Ross,* 992 F.2d 750, 753 (7th Cir.1993) "*Rooker–Feldman* 'simply forbids federal district court appellate review of state court judgments in the guise of collateral attacks when no federal statute authorizes such review.' " (quoting James S. Liebman, *Apocalypse Next Time?: The Anachronistic Attack on Habeas Corpus/Direct Review Parity,* 92 Colum.L.Rev.1997, 2008 n. 46 (1992)), *cert. denied,* —— U.S. ——, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994). For ex-

ample, Congress authorized federal district courts to review state court decisions in habeas corpus proceedings. *Ritter,* 992 F.2d at 753; *Fariello,* 860 F.Supp. at 65; *see Illinois Legislative Redistricting Commission v. LaPaille,* 786 F.Supp. 704, 710 (N.D.Ill.) (the exception to *Rooker–Feldman* is habeas corpus cases), *aff'd,* —— U.S. ——, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992).

■ Subjecting public entities to the terms of the ADA is not the same as giving federal district courts appellate jurisdiction over state court judgments. Such a grant of appellate jurisdiction would necessarily create an exception to a federal statute expressly governing jurisdiction and to the well-established doctrine emerging from that statute. Had Congress intended such a sweeping change, it is not too much to expect that Congress would have said so in terms more direct than those used in the ADA. Any other inference would ignore not only the firm foundation to the *Rooker–Feldman* doctrine but the broad terms that have been used in expressing it. *See, e.g., Younger v. Colorado State Bd. of Law Examiners,* 625 F.2d at 375 ("We have held that the federal district courts may not exercise jurisdiction to review an adjudication by the state courts which is alleged to have *unlawfully* denied admission to a particular applicant for admission to the bar." (citations omitted) (emphasis added)). " '[A] plaintiff may not seek reversal of a state court judgment simply by casting his complaint in the form of a civil rights action.' " *Ritter,* 992 F.2d at 754 (quoting *Hagerty v. Succession of Clement,* 749 F.2d 217, 220 (5th Cir.1984), *cert. denied,* 474 U.S. 968, 106 S.Ct. 333, 88 L.Ed.2d 317 (1985)). Nor does a plaintiff have the right to a federal trial against a state court upon alleging the state court's judicial actions were discriminatorily motivated.[5] *See Muhammed v. Arkansas Supreme Court Committee on Professional Conduct,* 655 F.Supp. 584, 586 (E.D.Ark.1986), *aff'd,* 815 F.2d 711 (8th Cir.1987) (Table).

Another untenable argument is that for purposes of the *Rooker–Feldman* doctrine

---

5. Johnson argues the district court has jurisdiction of this case as a proceeding arising under or related to his Chapter 13 bankruptcy case. The court finds no merit to this argument or to the authorities cited by him.

there is a relevant distinction between an action under 42 U.S.C. § 1983 and a claim of discrimination under the ADA. The justification for the doctrine has little to do with the type or nature of the federal claims asserted. Federal district courts "do not have jurisdiction ... over challenges to state-court decisions in particular cases arising out of judicial proceedings *even if those challenges allege that the state court's action was unconstitutional."* *Feldman,* 460 U.S. at 486, 103 S.Ct. at 1317 (emphasis added). The caselaw does not make the doctrine's operation dependent on the legal grounds offered for reviewing a state court's decision on a bar application. Beyond the more common due process and equal protection claims under § 1983, courts also have applied the *Rooker–Feldman* doctrine so as to foreclose review of state court judgments on allegations of race discrimination, *Leaf v. Supreme Court of State of Wisconsin,* 979 F.2d 589, 594 (7th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 2417, 124 L.Ed.2d 639 (1993), *Thomas v. Kadish,* 748 F.2d at 277; violations of the ADA, *McCready v. Illinois Bd. of Admissions to the Bar,* No. 94–C–3582, 1995 WL 29609 at *1, 4–5, 1995 U.S.Dist. LEXIS 791 at *1, *14–*16 (N.D.Ill. Jan. 24, 1995), *Ellen S. v. Florida Bd. of Bar Examiners,* 859 F.Supp. 1489, 1495 (S.D.Fla.1994), *Clark v. Virginia Bd. of Bar Examiners,* 861 F.Supp. 512, 515–516 (E.D.Va.1994); violations of the Commerce Clause, *Scariano v. Justices of Supreme Court of State of Indiana,* 852 F.Supp. 708, 710 (S.D.Ind.), *aff'd,* 38 F.3d 920 (7th Cir.1994); violations of the Rehabilitation Act of 1973, *Martin v. Walmer,* No. 90–2752, 1990 WL 145759 at *1, 2, 6, 7, 1990 U.S.Dist. LEXIS 13285 at *3, *17–*18 (E.D.Pa. Sept. 26, 1990); and violations of the Sherman Act, *Feldman,* 460 U.S. at 468, 103 S.Ct. at 1307. Whatever appreciable differences may exist between § 1983 and ADA in terms of structure, scope and purpose simply do not bear on the doctrine's function and operation.

According to Johnson, the court in *D'Amico v. New York State Bd. of Law Examiners,* 813 F.Supp. 217 (W.D.N.Y.1993), concluded that a federal district court has jurisdiction under the ADA to determine the reasonableness of a state board's accommodation of a disabled applicant during a bar examination procedure. (Dk. 5 at 58). In its perusal of the *D'Amico* opinion, the court finds no discussion of any jurisdictional issue. Indeed, the state board in *D'Amico* stipulated that the ADA applied to its examination procedure and that it was required to make reasonable accommodations for disabled applicants. 813 F.Supp. at 219. *D'Amico* offers no analysis of the *Rooker–Feldman* doctrine and, in particular, of the judicial or administrative nature of the board's proceedings for deciding upon reasonable accommodations. In short, Johnson overstates the holding in *D'Amico,* for it provides no conclusions or analysis bearing on the significant jurisdictional questions at issue here.

 Johnson next contends that his action does not seek judicial review of a state court's final judgment. In addressing this contention, the court will enlarge on its discussion of the *Rooker–Feldman* doctrine. The doctrine can be distilled to a two-prong test: (1) whether the state court's proceedings were judicial in nature, and (2) if so, whether the plaintiff's claims seek direct review of the state court decision or are so inextricably intertwined with the state court proceedings as to make the adjudication of the plaintiff's claims an impermissible review of state judicial proceedings. *See Leaf v. Supreme Court of State of Wis.,* 979 F.2d at 596; *Facio v. Jones,* 929 F.2d at 543; *McCready v. Illinois Bd. of Admissions to the Bar,* No. 94–C–3582, 1995 WL 29609, 1995 U.S.Dist. LEXIS 791 (N.D.Ill. Jan. 24, 1995).

 The Kansas Supreme Court argues the proceedings to determine if Johnson possessed the requisite fitness and character to sit for the bar examination and to practice law in Kansas were judicial in nature. Johnson does not directly challenge or dispute this characterization of the state court proceedings. Indeed, the caselaw, without relevant exception, supports the defendant's position. *See, e.g., Feldman,* 460 U.S. at 476–82, 103 S.Ct. at 1311–15; *Thomas v. Kadish,* 748 F.2d at 279–82; *Younger v. Colorado State Bd. of Law Examiners,* 625 F.2d 372, 375 (10th Cir.1980); *Clark v. Virginia Bd. of*

1082

*Bar Examiners,* 861 F.Supp. at 514–15; *McCready,* 1995 WL 29609 at *2, 1995 U.S.Dist. LEXIS 791 at *4–*5.

Kansas is not an exception to the general rule that bar admission proceedings are judicial in nature. The Kansas Supreme Court spells out in Rule 701(g) that "[a]pplications for admission, reports, decisions, Board proceedings, and documents obtained, or testimony received in the course thereof pursuant to these Rules shall be deemed to be made in the course of judicial proceedings." The application for admission is treated as a petition to the Kansas Supreme Court, Rule 704(b)(1), and the applicant is given the burden of showing by clear and convincing evidence that he or she possesses the requisite fitness and character, Rule 704(c). To conduct character and educational investigations, the Board virtually possesses the same powers as courts to hold hearings, to administer oaths, to compel attendance of witnesses and production of documents by subpoena, and to take and hear testimony. Rule 704(c). The Board's decision to grant or deny a petition is only a recommendation to the Kansas Supreme Court. Rule 704(i). The Board's recommendation to deny a petition based on lack of moral character or educational qualifications is filed with the Clerk of the Appellate Courts, and the applicant may file exceptions with the Kansas Supreme Court. Rule 704(i). "The Supreme Court will then make a final determination based upon the record, exceptions and response, if any, and enter its final order." Rule 704(i).

The Supreme Court in *Feldman* held that the nature of the waiver proceedings being reviewed was "judicial" and not "legislative, ministerial, or administrative." 460 U.S. at 479, 103 S.Ct. at 1313. " 'A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist.' " *Feldman,* 460 U.S. at 477, 103 S.Ct. at 1312 (quoting *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908)). In contrast, the non-adjudicative or administrative acts are either legislative or ministerial. *Guarino v. Larsen,* 11 F.3d at 1157. A legislative act " 'looks to the future and changes existing conditions by

making a new rule to be applied thereafter to all or some part of those subject to its power.' " *Feldman,* 460 U.S. at 477, 103 S.Ct. at 1312 (quoting *Prentis,* 211 U.S. at 226, 29 S.Ct. at 69). A ministerial act is one "based on preferences of the actor" without involving those preferences already "inscribed in existing law." *Guarino,* 11 F.3d at 1157. Examples of ministerial acts exercised by state courts include "the appointment of a clerk or bailiff or the specification of the requirements of eligibility or the course of study for applicants for admission to the bar." *Feldman,* 460 U.S. at 477–478, 103 S.Ct. at 1312 (citation omitted).

Though the waiver proceedings in *Feldman* did not "assume the form commonly associated with judicial proceedings," it was their "nature and effect ... [that was] controlling." 460 U.S. at 482, 103 S.Ct. at 1314. In particular, the court conducted a judicial inquiry and adjudicated the applicant's " 'claim of a present right to admission to the bar.' " 460 U.S. at 481, 103 S.Ct. at 1314 (quoting *In re Summers,* 325 U.S. 561, 568, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945)). The same can be said for the admission proceedings conducted with regards to Johnson's application. There was a judicial inquiry conducted into Johnson's fitness and character and a finding made that Johnson had not shown by clear and convincing evidence that he possessed the requisite fitness and character. "The state court did not act in a legislative role; it promulgated no new rules. Neither did the court act in an administrative or ministerial role; instead it fully adjudicated and rejected" Johnson's claims of a present right to take the bar examination and practice law in Kansas. *See Leaf,* 979 F.2d at 597.

The *Rooker–Feldman* doctrine recognizes circumstances when a federal court may hear a general challenge to state court rules if it does "not require review of a final state-court judgment in a particular case." *Feldman,* 460 U.S. at 486, 103 S.Ct. at 1317. The Supreme Court in *Feldman* quoted from *Doe v. Pringle,* 550 F.2d 596, 597 (10th Cir.1976), *cert. denied,* 431 U.S. 916, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977), the following discussion distinguishing between

general challenges to state bar admission rules and specific challenges to the denial of a particular applicant's admission:

"The United States District Court, in denying [the plaintiff] relief, declared that there is a subtle but fundamental distinction between two types of claims which a frustrated bar applicant might bring to federal court: The first is a constitutional challenge to the state's general rules and regulations governing admission; the second is a claim, based on constitutional or other grounds, that the state has unlawfully denied a particular applicant admission. The Court held that while federal courts do exercise jurisdiction over many constitutional claims which attack the state's power to license attorneys involving challenges to either the rule-making authority or the administration of the rules, . . . *such is not true where review of a state court's adjudication of a particular application is sought.* The Court ruled that the latter claim may be heard, if at all, exclusively by the Supreme Court of the United States."

460 U.S. at 485, 103 S.Ct. at 1316. The Supreme Court accepted this distinction and then developed the circumstances when subject matter jurisdiction exists:

Challenges to the constitutionality of state bar rules, therefore, do not necessarily require a United States District Court to review a final state court judgment in a judicial proceeding. Instead, the District Court may simply be asked to assess the validity of a rule promulgated in a nonjudicial proceeding. If this is the case the District Court is not reviewing a state-court judicial decision. In this regard, 28 U.S.C. § 1257 does not act as a bar to the District Court's consideration of the case and because the proceedings giving rise to the rule are nonjudicial the policies prohibiting United States District Court review of final state-court judgments are not implicated. United States District Courts, therefore, have subject-matter jurisdiction over general challenges to state bar rules, promulgated by state courts in nonjudicial proceedings, which do not require review of a final state-court judgment in a particular case. They do not have jurisdiction, however, over challenges to state-court de-

cisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional. Review of those decisions may be had only in this Court. 28 U.S.C. § 1257.

460 U.S. at 486, 103 S.Ct. at 1317. The distinction between a permissible general challenge to rules and an impermissible appeal of a state court judgment often is subtle and "difficult to draw." *Razatos v. Colorado Supreme Court,* 746 F.2d 1429, 1433 (10th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985); *see Dubinka v. Judges of Superior Court,* 23 F.3d 218, 221 (9th Cir.1994). There are no bright dividing lines. *Ritter,* 992 F.2d at 754. It is a case-by-case determination focused principally on the question whether the district court is essentially " 'being called upon to review the state-court decision.' " *Fariello v. Campbell,* 860 F.Supp. at 65 (quoting *Feldman,* 460 U.S. at 483–84 n. 16, 103 S.Ct. at 1316 n. 16); *see Ritter,* 992 F.2d at 754 ("Do the constitutional claims, then, force a district court to assume appellate jurisdiction over the state court judgment?").

Johnson says he is not seeking judicial review of defendant's decision denying his application. Instead, he assumes the defendant correctly followed and applied its "preexisting body" of rules, procedures and policies in its decision on his application. Johnson asserts his dispute is with that "preexisting body" of standards as having "an illegal discriminatory component." (Dk. 5 at 62). In his complaint, Johnson challenges three "policies, patterns or established practices" that he now argues are part of the "preexisting body" of standards. Those three standards are: (1) denying admission to "applicants who have a history of bipolar disorder or other major or chronic mental illnesses unless those applicants can present proof that their illnesses are permanently 'cured,' " (Dk. 1 at 9); (2) denying admission to applicants "who indicate that a criminal conviction they disclose was influenced by a mental illness unless those applicants can present proof that the mental illness involved is now permanently 'cured,' " (Dk. 1 at 10); and (3) "refusing to consider the possibility

of probational admission as an accommodation to successfully treated but not cured mental illness in original admission cases," (Dk. 1 at 10). Johnson essentially concedes that these three alleged "standards" are not a formal or express policy and cannot be found in any written rule regarding bar admissions in Kansas. (Dk. 5 at 61). Relying on comments made by the Disciplinary Administrator during the investigation and by Board members during the hearing, Johnson infers the Kansas Supreme Court had a "practice" of disqualifying applicants based on these three so-called "standards." Johnson maintains he seeks only "declaratory relief ... [regarding] the denial of his application ... and an award of damages for loss of income due to the delay in admission caused by these faulty policies or practices." (Dk. 5 at 63).

Johnson's efforts to paint his case as a general challenge to state bar admission rules are unavailing. The relief he seeks and the claims he alleges are "inextricably intertwined" with the Kansas Supreme Court's decision. *See Feldman,* 460 U.S. at 486, 103 S.Ct. at 1317. Johnson's requested declaratory relief is directed at the Kansas Supreme Court's judgment on his application. Consequently, the court cannot grant this relief without first reviewing and then invalidating a state court's final judgment. *Centifanti v. Nix,* 865 F.2d 1422, 1429, 1429 n. 8 (3rd Cir.1989); *Stern v. Nix,* 840 F.2d 208, 212 (3rd Cir.), *cert. denied,* 488 U.S. 826, 109 S.Ct. 77, 102 L.Ed.2d 53 (1988).

The overwhelming thrust of Johnson's complaint is a challenge to the Kansas Supreme Court's denial of his application rather than any general challenge to state rules. It does not appear possible to sift from Johnson's complaint the general challenges only. The plaintiff's disability allegations are not " 'separable from and collateral to' " the merits of the state court's decision. *Fariello,* 860 F.Supp. at 65 (quoting *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 21, 107 S.Ct. 1519, 1531, 95 L.Ed.2d 1 (1987) (Brennan, J., concurring) (citations omitted)); *see Ritter,* 992 F.2d at 754. Johnson's attack is limited to the merits of the Kansas Supreme Court's decision on his application and to the ostensible poli-

cies as applied to him. These are not general challenges over which this court would have original jurisdiction. *See Musslewhite,* 32 F.3d at 947.

■ "In order to resolve them [the plaintiff's general challenges], the district court would have to go beyond the mere review of the state rule *as promulgated,* to an examination of the rule *as applied* by the state court to the particular factual circumstances of Feldman's [the plaintiff's] case." *Razatos v. Colorado Supreme Court,* 746 F.2d at 1433. The plaintiff does not show that the Kansas Supreme Court has promulgated any rule or regulation consistent with the three so-called "standards" alleged in his complaint. "Courts have generally concluded that claims are inextricably intertwined when the district court must scrutinize both the challenged rule and the state court's application of that rule." *Dubinka,* 23 F.3d at 222 (citations omitted). Calling state court precedent by another name does not transform those individual judicial decisions into a rule or regulation subject to decisions. That the plaintiff can see a pattern or a chain of precedent in state court decisions as proved in part by comments from Board members or the Disciplinary Administrator does not elevate the separate judicial decisions into a promulgated rule or policy. Each of the state decisions in that alleged pattern or chain was the result of a separate state judicial proceeding adjudicating an individual application that may not be reviewed in this court. The parties have not referred to any promulgated rule from the Kansas Supreme Court concerning its admission decision on one applicant having any precedential force on an admission decision involving another applicant. The mere fact that a judicial decision is novel does not make it non-adjudicative or administrative in nature. *Guarino,* 11 F.3d at 1157. Nor can the court conclude from the scant record and cursory arguments of the parties that the Board's interpretation of the Kansas Supreme Court's prior admission decisions or conjecture over what the Kansas Supreme Court might do under similar circumstances amounts to a promulgated rule. What is clear from the record is the absence of any non-judicial proceedings out of which the alleged "standards" were pro-

mulgated. *See Feldman,* 460 U.S. at 486, 103 S.Ct. at 1317. The Kansas Supreme Court's decision on Johnson's application does not reveal any intent to invoke general administrative powers over the bar beyond deciding the pending application. *Cf. Schneider v. Colegio de Abogados de Puerto Rico,* 917 F.2d 620, 628–29 (1st Cir.1990), *cert. denied,* 502 U.S. 1029, 112 S.Ct. 865, 116 L.Ed.2d 772 (1992). For these reasons, there are no "standards" or challenges thereto that can be decided without reviewing the Kansas Supreme Court's decision on Johnson's application.

The "'federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it.'" *Centifanti v. Nix,* 865 F.2d at 1430 (quoting *Pennzoil,* 481 U.S. at 25, 107 S.Ct. at 1533 (Marshall, J., concurring)). Johnson fully briefed nearly identical disability allegations before the Kansas Supreme Court. Those disability allegations were necessarily addressed and decided when the court denied Johnson's petition.[6] *See Michigan v. Long,* 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983) (When "a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so."); *Arizona v. Evans,* —— U.S. ——, 115 S.Ct. 1185, 131 L.Ed.2d 34, 41 (1995). Because Johnson now wants to assert in federal court the same disability claims he made to the Kansas Supreme Court, he essentially asks the federal court to review the state court's denial of those claims. *Landers Seed Co., Inc. v. Champaign Nat. Bank,* 15 F.3d 729, 733 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 62, 130 L.Ed.2d 20 (1994); *Leaf,* 979 F.2d at 599 (Because the plaintiff "raised the same barrage of claims" in the

state proceedings, the plaintiff's federal claims are "inextricably intertwined with those raised before and addressed by the" state court.) Federal court review of the Kansas Supreme Court's decision on those disability claims lies exclusively with the United States Supreme Court. 28 U.S.C. § 1257.

Somewhat in passing, Johnson complains that if only formal policies may be challenged and not the application of those policies to particular applicants, then "any state court may discriminate against applicants having any particular disability with impunity by doing so informally (to divest the federal district court of jurisdiction) and refusing to discuss ADA issues in reports and orders denying applications (to evade review by the United States Supreme Court)." (Dk. 24 at 10–11). That a state's highest court would knowingly violate a federal law and then would actively conceal its violation seems such an unlikely proposition that it hardly warrants discussion, let alone being cause for exercising jurisdiction in the face of the *Rooker–Feldman* doctrine. "[A]ny concern about whether the *Feldman* rule effectively isolates state court decisions from federal review is unfounded." *Facio v. Jones,* 929 F.2d at 545. First, the state court decisions are subject to certiorari review by the United States Supreme Court. Second, a litigant in the future may be able to prove that the Kansas Supreme Court has promulgated rules in a non-judicial proceeding regarding the admission of bar applicants with mental impairments. Johnson has fully pursued his remedy in the Kansas Supreme Court and subsequently in the United States Supreme Court and is bound by the adverse result. *Grossgold v. Supreme Court of Illinois,* 557 F.2d 122, 125 (7th Cir.1977).

IT IS THEREFORE ORDERED that the defendant's motions for summary judgment and dismissal (Dk. 12) is granted on the ground that the court lacks subject matter jurisdiction;

---

6. For that matter, the Supreme Court's jurisdiction on certiorari does not "depend on whether the state court addressed the question; it is enough that a federal claim was made, and not accepted." *Lynk v. LaPorte Superior Court No. 2,* 789 F.2d 554, 564 (7th Cir.1986) (citations omitted).

IT IS FURTHER ORDERED that the plaintiff's motion to strike and for partial judgment on the pleadings (Dk. 5) is denied;

IT IS FURTHER ORDERED that the defendant's motion to strike affidavit of the plaintiff's counsel (Dk. 30) is denied as moot.